UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                    :

UNITED STATES OF AMERICA           :

                             :

   - v. -                     :         S1 18 Cr. 762 (JSR)

                             :

HAJI ABDUL SATAR ABDUL MANAF,   :
      a/k/a "Haji Abdul Sattar Barakzai,"  :

                             :

             Defendant.      :

                             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# THE GOVERNMENT'S SENTENCING SUBMISSION

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
26 Federal Plaza
New York, New York 10278

Sam Adelsberg
Nicholas S. Bradley
Kimberly J. Ravener
Assistant United States Attorneys
*- Of Counsel -*

**PRELIMINARY STATEMENT**

The Government respectfully submits this memorandum with respect to the sentencing of defendant Haji Abdul Satar Abdul Manaf, currently scheduled for December 13, 2024.  The trial in this case demonstrated that Manaf worked with terrorists, particularly the Taliban, to profit from the heroin trade in Afghanistan; sought to import hundreds of kilograms of heroin into the United States with the Taliban's help; and tried to help transmit drug money to members of the Taliban's most dangerous faction—the Haqqani Network—before he was apprehended and extradited to face justice in the United States.

Manaf's crimes did not end there.  Following his arrest and extradition, and while incarcerated in New York pending trial in this very case, the defendant directed members of his family in Afghanistan to kidnap and threaten a DEA source—a witness to his crimes—in an effort to silence him.  The defendant's family members then did as the defendant directed—they kidnapped that DEA source at gunpoint in Afghanistan.  Then they threatened to kill him.

Manaf's arrest and conviction was the culmination of a lifetime of drug trafficking and money laundering to benefit terrorists and himself.  The defendant's narco-terrorism secured him a place of power, influence, and wealth in Afghanistan, including a compound in Kandahar where he was protected by heavily armed guards. He ran a hawala network that moved money around the world.  And in conversations recorded during this investigation, he explained in vivid detail that he had spent his entire life in the heroin trade, had deep connections to high-ranking Taliban officials, and that prominent members of the Haqqani Network were "sustained" by his support. In short, for years, the defendant was a multi-faceted narco-terrorist on a massive scale.

For his narco-terrorism crimes alone, he now faces a mandatory minimum term of imprisonment of 20 years, and that is before taking into account his brazen scheme to kidnap and

1

silence a witness against him.  For his crimes, the defendant now faces a Guidelines sentence of life imprisonment.  Full consideration of the Section 3553(a) factors should lead to a sentence that appropriately weighs the gravity of the defendant's narco-terrorism crimes, along with a consecutive term of imprisonment for the heinous acts of witness retaliation that followed.  For the reasons set forth below, the Government respectfully submits that a sentence of at least 35 years of imprisonment is sufficient but not greater than necessary to serve the purposes of sentencing and would be fair and appropriate in this case.

## RELEVANT BACKGROUND

### I.    Overview of the Offense Conduct

On August 1, 2024, the defendant, a prolific heroin trafficker who operated out of Afghanistan, was convicted following a jury trial of all five counts charged in Superseding Indictment S1 18 Cr. 762: attempted narcotics importation, in violation of Title 21, United States Code, Section 959 (Count One); one count of narco-terrorism and one count of attempted narco-terrorism, each in violation of Title 21, United States Code, Section 960a (Counts Two and Three, respectively); and one count of witness tampering conspiracy and one count of witness tampering, each in violation of Title 18, United States Code, Section 1512(a)(2) (Counts Four and Five, respectively).  (PSR ¶¶ 1-8).

At trial, the evidence showed that Manaf, whom the Treasury Department previously sanctioned for providing financial and other support to the Taliban, attempted to import large quantities of heroin into the United States; partnered with the Taliban in his heroin trafficking operations; and attempted to provide support to the Haqqani Network in connection with heroin trafficking.  In particular, Manaf agreed to provide large quantities of heroin to an undercover DEA agent ("the UC") for sale in the United States, while making clear that the anticipated transaction

2

financially benefitted the Taliban. In connection with the transaction, Manaf supplied a ten-kilogram heroin sample shipment (the "Ten Kilo Shipment"). (PSR ¶¶ 35-43). The Ten Kilo Shipment was marked with a stamp that Manaf "registered" with the Taliban, meaning that he had paid the Taliban so only he could use the stamp to mark his heroin, and helped transfer tens of thousands of dollars in purported narcotics proceeds from Australia to Afghanistan, where he had been told it would be used to fund the Haqqani Network. (PSR ¶¶ 32-44).

The defendant was not chastened or deterred by his arrest and extradition for these offenses. Instead, while incarcerated at the Metropolitan Correctional Center ("MCC") in New York pending trial in this case, the defendant brazenly directed members of his family in Afghanistan to kidnap and intimidate a DEA confidential source in an effort to silence him, kicking off a years-long campaign of intimidation by the defendant's co-conspirators against the DEA's sources in this case and their families. (PSR ¶¶ 46-50).

## II.     Defendant's Background and OFAC Designation

On June 29, 2012, OFAC sanctioned Manaf and his international money exchange business, Haji Khairullah Haji Sattar Money Exchange ("HKHS"), "for donating money and providing financial services to the Taliban" and added him to its list of Specially Designated Nationals and Blocked Persons, pursuant to Executive Order No. 13224. (PSR ¶ 98). As a result of the OFAC designation, all property in the United States or in the possession or control of U.S. persons in which HKHS or Manaf had an interest was blocked, and U.S. persons were prohibited from engaging in transactions with Manaf or HKHS. (*Id.*) OFAC's press release announcing the designation noted that the defendant's support of the Taliban dated back to at least 2008:

> [Manaf] has donated thousands of dollars to the Taliban to support Taliban activities in Afghanistan and has distributed funds to the Taliban using his hawala. As of 2010, [Manaf] provided financial assistance to the Taliban. As of late 2009, [Manaf] provided tens of thousands of dollars to aid the

3

Taliban's fight against Coalition Forces in Marjah, Nad'Ali District, Helmand Province, Afghanistan, and helped to transport a Taliban member to Marjah. As of 2008, [Manaf] and Khairullah collected money from businessmen and distributed the funds to the Taliban using their hawala.[1]

(*Id.*) In concert with this designation, during this investigation, the defendant repeatedly told the UC that he was on the "blacklist of America," a reference to the defendant's designation by OFAC for his support to the Taliban. (*Id.*) The defendant also explained that he had a "moneychanger shop by the name of Khairullah and Sattar" and that "[w]hen you see me in person, you will know me." (GX 201D-T; PSR ¶ 98).

### III.    The Defendant's Narco-Terrorism and Attempted Heroin Importation

Between January and October 2018, in a series of in-person meetings, recorded telephone calls, and electronic communications, Manaf arranged to import large quantities of heroin into the United States with the assistance of—and recognizing that some of the proceeds of that narcotics trafficking would be provided to—the Taliban and the Haqqani Network. Unbeknownst to Manaf, certain of the individuals he communicated with during this time period included the UC and four DEA confidential sources ("CS-1," "CS-2," "CS-3," and "CS-4," and, collectively, the "CSes").[2]

In January and February 2018, CS-1, operating at the direction of the DEA, and the defendant, discussed executing a large-scale heroin deal with the UC. (PSR ¶¶ 13-14). Manaf had previously told CS-1 about his history of trafficking heroin and was well-prepared to execute a large deal: for example, documents obtained from Manaf's phone following his arrest in this case include a bill of lading dated October 15, 2017—approximately two months before his initial

---

[1] *See* U.S. Department of the Treasury, Treasury Targets Money Exchange Houses for Supporting the Taliban, *available at* https://home.treasury.gov/news/press-releases/tg1627 (June 29, 2012).

[2] At trial, three of the confidential sources testified under pseudonym as "Amir Khan" (CS-1) "Sultan Shah" (CS-2), and "Fareed Naseeri" (CS-4). The UC testified under pseudonym as "Sam Rahi."

conversation with CS-1—detailing the shipment from China to Iran of 80 drums (16,840 kilograms) of acetyl chloride, a key chemical used to make heroin. (GX 501A). Manaf sent CS-1 a recorded message referring to this chemical as "gold." (GX 805-T).[3]

Beginning in February 2018, the defendant started communicating directly with the UC, who posed as a large-scale narcotics trafficker based in the United States. (PSR ¶ 14). Over the course of many subsequent recorded calls and messages, Manaf and the UC discussed, among other things, arranging for Manaf to provide the UC with large quantities of heroin for shipment to the United States, as well as providing money to the Haqqani Network and the Taliban for their assistance and protection in Manaf's and the UC's drug trafficking. During their first phone conversation in February 2018, which was initiated by Manaf, Manaf stated he was looking for a drug trafficking route into the United States—specifically, that "I have been after it so much, but I haven't been able to find a good person." (GX 201B-T). In the many conversations that followed, Manaf committed to the UC that he would make the heroin, handle the manufacturing, and handle the transportation. (See GX 207B-T ("I bought opium and made beest [a heroin precursor] out of the opium, … 10 or 11 pieces. Making will be in our hands."), GX 207C-T (defendant says he has a heroin factory in Musa Qala)). It was during these conversations that the defendant also told the UC that he was currently on "the blacklist of America," a reference to the defendant's designation by OFAC. (PSR ¶ 14).

In additional recorded conversations with the UC, the defendant described his experience trafficking heroin to Pakistan, Tanzania, Iran, and Mozambique, among other countries, in order to establish his standing as a narcotics trafficker vis-à-vis the UC—whom the defendant believed

---

[3] Text messages seized from Manaf's phone show that Manaf was trying to track down that acid shipment to manufacture heroin days before he flew to Estonia to secure his intended massive heroin deal with the UC. (GX 501-T).

5

to be a New York-based narcotics trafficker—as well as to solicit possible future business from the UC. For example, during a June 20, 2018 recorded conversation with the UC, the defendant explained that over the last "six and a half months," he had "delivered a lot of rice there," to Iran—*i.e.*, he exported a significant amount of heroin from Afghanistan to Iran. (PSR ¶ 19). During the same conversation, the defendant told the UC, "if there is anyone who wants to do business, I can do it here. I don't want to brag about it. I have connection in this business. I also have experience." (PSR ¶ 20). The defendant also stated, "I was sending crystal from Pakistan to Tanzania," including "400 at one occasion and again 200." (PSR ¶ 19). Over the course of these calls, the defendant attempted to broker the sale of 1,800 kilograms of heroin stored in Mozambique to the UC. (PSR ¶ 25). Similarly, the defendant told CS-1 that he previously sold heroin in Indonesia, and imported acid used to make heroin to Afghanistan via Iran. (Tr. 640).

The defendant also explained to the UC how he had enlisted the Taliban in the drug trafficking business he intended to conduct with the UC. For example, during a July 24, 2018 recorded call, the defendant told the UC that he had "a bearded person here," "those mullahs," [that is, a Taliban member] who will "take money from you and me" as "commission" to handle "logistics," to include the route between Kabul to Kandahar. (GX 205A-T; PSR ¶ 27). Two days later, in a July 26, 2018 recorded call, the defendant confirmed to the undercover agent that "[t]hey deliver each kilogram . . . through the Taliban way," and that the Taliban charges a certain price per kilogram on certain routes. (GX 208A-T; GX 208B-T). Manaf told the UC that he had paid the Taliban to register a specific stamp, as shown below, for use only in Manaf's heroin production with the UC, and provided a copy of that stamp to the UC, as shown below in GX 307 (PSR ¶¶ 32, 38):

6



Referring to the Taliban, Manaf told the UC that "these people are very good for our business." (GX 209C-T). (PSR ¶ 38). Manaf described how he would pay the Taliban to transport the heroin for Manaf and the UC within Afghanistan, and promised that the heroin would be safe because the Taliban transporters would be armed. (*See, e.g.*, GX 206B-T; GX 207D-T; GX 208C-T; GX 209C-T; PSR ¶ 29). Manaf highlighted the advantages he had gotten from working with the Taliban to protect his drug loads, how the Taliban would "observe," "patrol," and "nobody will be able to touch them." (GX 209C-T; PSR ¶ 38).

Manaf later elaborated on how the Taliban would use violence to secure his drug loads. (GX 601I-T ("the Taliban are not like they just load the items and they go on . . . They load the items in 12 vehicles . . . with people, RPG, Daashaka and all of the ammunitions . . . they fight tank or anything that comes ok? . . . . They don't get money from me only, they get from all of you and us.")). When asked who was securing his factory, the defendant replied, "the Taliban, the Taliban, the Taliban." (GX 209C-T). The defendant explained how he had secured the aid of the top Taliban official in Helmand province, the Administrative Governor, for his drug trafficking, paying that official another approximately 150,000 Pakistani rupees. (GX 209C-T).

During the summer of 2018, Manaf also agreed to facilitate the transfer of approximately AU$50,000 to the Haqqani Network for the UC. (PSR ¶ 40). The UC told Manaf that the UC wished to pay the Haqqani Network as "zakat," a kind of religious donation to the organization,

noting that the Haqqani Network had allowed the UC to transport heroin through Haqqani territory and stored heroin within their territory to aid the UC's drug trafficking business. (PSR ¶ 24). Manaf agreed to transfer AU$50,000 from Australia to Afghanistan, and provide the money to the UC's associates, who would in turn give the money to the Haqqani Network. (PSR ¶ 41). The UC told Manaf that the AU$50,000 represented the UC's narcotics proceeds, which the UC intended to pay to the Haqqani Network. (PSR ¶ 40). On or about July 31, 2018, two DEA confidential sources—CS-3 and CS-4—posed as drug trafficking associates of the UC and met with Manaf at his home, a large compound in Kandahar, to discuss the payment to the Haqqani Network. (PSR ¶ 34). CS-4 observed that the defendant's home was protected by armed guards carrying pistols and Kalashnikov rifles, and that the defendant arranged for his transportation by an armed chauffeur driving a truck with blacked-out windows. (Tr. 478). During CS-4's meeting with Manaf, Manaf told CS-4 that the Haqqani Network was "sustained by our support," and that the Haqqani Network's terrorist commanders couldn't "operate" without drug money. (Tr. 485). Manaf asked CS-4 to identify the recipients of the zakat payments within the Haqqani Network. (Tr. 483). When CS-4 identified three top-level Haqqani commanders by name, Manaf told CS-4 "they are my guys" and agreed to facilitate the payments. (Tr. 484). At that same meeting, the defendant told CS-4 that they'd soon be working together on a lot of drug business with the UC. (Tr. 485 ("He told me that he actually has also arranged a powder dealing with Haji Dawood. And when that is achieved, you will know me very well and will have additional or further meetings as well."). Less than two weeks later, on or about August 12, 2018, Manaf arranged to provide the money to CS-2 in Afghanistan. (PSR ¶ 43). CS-2 retrieved the money in Kabul, Afghanistan. (*Id.*)

8

Also in August 2018, Manaf agreed to provide the Ten Kilo Shipment to the UC in Afghanistan for the UC to transport for sale in New York. (PSR ¶¶ 35, 40). Manaf and the UC agreed that, following the successful importation of the Ten Kilo Shipment into the United States, Manaf would send the UC larger, multi-hundred-kilogram quantities of heroin for importation to and distribution within the United States. (PSR ¶ 37).

The defendant communicated by telephone with the UC and CS-1 to arrange for the pickup of the Ten Kilo Shipment in Afghanistan and sent the UC a picture of the sample, depicted below, bearing the stamp he obtained from the Taliban. (PSR ¶ 37). The defendant also directed CS-1 to travel with CS-1's children when picking up the heroin to minimize the chance of being detected by Afghani authorities. (Tr. 681-82). On or about August 5, 2018, CS-1 picked up the Ten Kilo Shipment in Afghanistan and delivered it to CS-2, who delivered the Ten Kilo Shipment to DEA agents in Kabul, Afghanistan. (PSR ¶ 39; GX 309).



On or about October 9, 2018, Manaf met with the UC in Tallinn, Estonia, to discuss a future, larger heroin transaction. (PSR ¶ 45). During that meeting, Manaf agreed to provide the UC with a multi-hundred-kilogram heroin shipment for importation into the United States; confirmed that he had facilitated a money transfer on the UC's behalf to the Haqqani Network (which he identified by name); and described his years of financial support to the Taliban and the Haqqani Network. (PSR ¶ 45). During the meeting, Manaf discussed his knowledge of and relationship to numerous specific Taliban and Haqqani Network figures, whom he referenced by name (including Jalaluddin Haqqani, the group's original leader); his knowledge of the relationship between Osama Bin Laden and the Taliban, and Bin Laden's presence in Afghanistan; his reference to deceased Taliban members as "martyrs"; and his own participation in the formative meeting where Mullah Mohammad Omar became the "Amir al-Mu'minin," that is, the leader of the Taliban ("I was at the meeting; I was giving cards there; I was going back and forth"). (PSR ¶ 45). The deal that Manaf agreed on with the UC involved approximately 1,500 kilograms of heroin being shipped annually to the United States for sale and distribution in the New York City market, in shipments of approximately 500 kilograms each. (GX 601C-T; PSR ¶ 45). Manaf was arrested by Estonian authorities after the meeting. (PSR ¶ 45).

## IV.    The Defendant's Witness Tampering Conduct

On or about February 6, 2019, Manaf was extradited to the United States. (PSR ¶ 46). In a series of recorded prison calls in February and March 2019, Manaf directed his family members in Afghanistan to kidnap CS-1 in order to silence and intimidate CS-1. (PSR ¶ 47). Indeed, approximately three weeks after gaining access to the telephones at the MCC, Manaf called family members and directed them to bring CS-1 to Manaf's family home, to "not let him go even for a

10

minute," to take CS-1's phone, and to hand CS-1 over to a "security chief" who would make CS-1 "tell the whole story in two minutes." (PSR ¶ 47).

On or about February 28, 2019, as directed by Manaf days earlier and within weeks of Manaf's arrival in the United States, Manaf's brother and other relatives in Afghanistan—one of whom was armed with a Kalashnikov rifle—confronted CS-1, telling him, in sum and substance, that he had to come with them by force or voluntarily. (PSR ¶ 48). CS-1 went with Manaf's relatives from Helmand to Manaf's house in Kandahar. (*Id.*) Manaf's family then interrogated CS-1 about how the introduction between Manaf and the UC took place and told CS-1 that it was his fault Manaf had been arrested. (*Id.*) During the interrogation, Manaf, calling from the MCC, spoke with several of the same family members, who were together at Manaf's family home. (*Id.*) Manaf's family members told Manaf that CS-1 was there, and that they had questioned him, and he had denied introducing Manaf to the UC. Manaf told his family that CS-1 was not being truthful, and then spoke directly with CS-1, telling him, in sum and substance, that Manaf did not know the UC well but that CS-1 had vouched for the UC. (*Id.*) The recorded jail calls reflect that Manaf then spoke with his relatives, instructing them to take CS-1's phone and password, and hand CS-1 to a third party, who would make CS-1 "confess like a bird" and reveal everything "in two minutes" because "otherwise he can cause harm to me here." (*Id.*) Manaf also instructed his family that if CS-1 was not willing to "confess," they should not let him leave. (*Id.*)

During CS-1's kidnapping, members of Manaf's family assaulted CS-1 and threatened his life. (PSR ¶ 49). In particular, after Manaf dialed into the interrogation, Manaf's brother seized CS-1's phone. (*Id.*) Then, while one family member held CS-1's arms, another family member punched CS-1 in the face. (*Id.*) Manaf's brother then asked his son to bring his Kalashnikov into the room so that he could kill CS-1. (*Id.*) Manaf's brother told CS-1 "You're an American spy,

11

I'm going to shoot you. I'm going to kill you." (Tr. 703; PSR ¶ 49). However, after CS-1's uncle (who was also present) intervened, Manaf's brother finally agreed to let CS-1 leave—after CS-1 was held against his will for many hours—if he (CS-1) agreed to bring them the UC. (Tr. 703). Before CS-1 was allowed to leave, Manaf's brother told CS-1 that if he (CS-1) did not bring the UC or the UC's family then: "I will kill you or your family, your father, or brother or son, anyone." (Tr. 704; PSR ¶ 49). Manaf's family did not return CS-1's phone, but allowed a member of CS-1's family to pick it up at a later date. (PSR ¶ 49).

As detailed further below, on several occasions since March 2019, members of Manaf's family and members of the Taliban have contacted CS-1 and members of CS-1's family, threatening to kill him and his family. (PSR ¶ 50). Similarly, since Manaf's extradition, CS-2 and CS-2's family have also been threatened by members of the Taliban for his involvement in this case. (*Id.*) Manaf and his associates obtained CS-2's true name during this investigation, and Manaf took a photograph of himself with CS-2 which he transmitted to an associate prior to his arrest. (*Id.*) On recorded jail calls, Manaf gave directions to a family member regarding intimidating CS-2. (*Id.*) In the months and years since, both CS-1 and CS-2 faced a barrage of threats from Manaf's family and members of the Taliban, including the following (*Id.*):

- In or about May 2019, the defendant's brother threatened CS-1 that we're not going to let you get away with this. He also told Amir Khan that we will decide how to deal with you and your family when we see what happens with Abdul Satar [*i.e.*, the defendant] in his case. (*See also* GX S7).

- On or about April 22, 2020, a threat letter was sent to CS-2's family by Taliban leaders, outlining CS-2's work with the United States Government ("your son, who is working with the disbelievers"). The letter was on Taliban letterhead and claimed that "[t]here have been major commanders of the Mujahiddin who have been arrested under the name of smuggler/drug trafficker . . . [and] taken to the countries of the disbelieves by the help of your son," a reference to CS-2's responsibility for the arrest of Manaf. The letter explicitly threatened that "[i]n the case that we catch you, your entire family will be killed by the Mujahiddin."

- In or about August 2021, Taliban members surrounded CS-2's family home in Afghanistan and demanded to know where CS-2 was located. The Taliban then rummaged through the house, confiscated documents reflecting CS-2's work for the United States, and physically beat CS-2's uncle.

- In or about January 2021, the defendant's brother threatened CS-1 and CS-1's family. The brother said, in substance and in part, that he was not going to let CS-1 get away with this and that he would "ruin" CS-1's family. The defendant's brother further "vowed and prayed" that he "will have the chance to avenge for each of the nights that [the defendant] has spent [in jail]."

- In or about August 2021, Taliban members confiscated CS-1's home and told his brother that they were doing so because the house belongs to someone working for the American government. A few weeks later, in or about September 2021, Taliban members provided CS-1's brother with two letters demanding that he appear at a certain place and time. To date, the Taliban has not returned CS-1's home to the CS-1 or his family.

- In or about January 2022, CS-1's relative, who is also related to Manaf, told CS-1 that he heard that CS-1 is involved in Manaf's case and that CS-1 is working with the Americans. CS-1's relative then pressed CS-1 about whether CS-1 was working with the Americans. Approximately five days later, CS-1's stepmother, two brothers, and two sisters went to the relative's house and have not been allowed to leave ever since. At one point, CS-1's relative told CS-1 that it is dangerous for CS-1 to come to the location of the home and that CS-1's family cannot leave. Through at least the time period of the trial, CS-1's family had not been allowed to leave the house unsupervised and CS-1 cannot visit them.

- Over the past several years, including as recently as March 2024, CS-1 has received approximately 15 WhatsApp calls from individuals who explicitly identified themselves as members of the Taliban or their WhatsApp profile photos indicated that they were Taliban. These individuals told CS-1, in substance, that they know CS-1 is spying for the Americans, that he needs to stop, that he will not be able to leave Afghanistan, and that he cannot hide from the Taliban. One Taliban member told CS-1: "these U.S. dollars you're using are not free," which CS-1 understood to be a threat to him and his family for receiving financial support from the United States.

The Government continues to investigate the defendant's role and participation in these continued threats to witnesses. Following the trial in this case, and following the issuance of the Presentence Report, the Government learned that a contraband cellphone was seized from the defendant on or about October 29, 2024. It was found hidden within the defendant's mattress in

13

his prison cell at the Metropolitan Detention Center.  The Government obtained a search warrant to examine the contents of the cellphone, and its review is ongoing.[4]  Preliminary analysis confirms that the cellphone contains substantial content, including voice notes exchanged in Pashto, the defendant's native language, dating back months, including during the time period of his trial before this Court.

## THE PRESENTENCE REPORT

The Presentence Report reflects that a total offense level of 43 applies to Manaf's convictions, and that Manaf falls within Criminal History Category VI.  (PSR at 36).  The Guideline imprisonment range is therefore life imprisonment.  (*Id*.)

The Probation Office recommends a sentence of 420 months' imprisonment.  (*See* PSR Sentencing Recommendation at 38).  The Probation Office observes that a significant sentence is warranted "in order to send a message of general deterrence across terrorist organizations" and to provide just punishment for the defendant's criminal actions, which included financial support to terrorists, the context of the "atrocities committed by the Taliban and the Haqqani Network," and the defendant's direction of others "to kidnap and violently threaten a witness" in this case.  (*Id*. at 37-38).  The Probation Office advises that "one cannot overlook the immense and potential harm done to the witness and the unmeasurable amount of indirect victims in this criminal activity." (*Id.*)  The Probation Office also notes that, although it recommended a variance, "the defendant is still essentially receiving a life sentence" through its recommendation, and that "a large variance

---

[4] The Government promptly produced a copy of the search warrant, the search warrant application, and a copy of the cellphone extraction to the defense.  The Government reserves the right to call additional facts to the Court's attention, and modify its sentencing recommendation accordingly, as this review continues.

14

would have the opposite effect on the public and send the wrong message that one can do so much harm without relative punishment." (*Id.* at 38).

In an earlier letter filed with the Probation Office, and in the PSR itself, Manaf registers several objections to the PSR. (*Id.* at 30). The Government responds to Manaf's objections in a chart, also provided to the Probation Office, attached hereto as Ex. A. (*See also id.* at 30-34.)

## APPLICABLE LAW

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007). After that calculation, a sentencing judge must consider the seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

15

18 U.S.C. § 3553(a)(2).    To the extent the Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *United States* v. *Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall*, 552 U.S. at 50).

## ARGUMENT

For the reasons explained below, the Government respectfully submits that a sentence of at least 35 years of imprisonment, consistent with the Probation Office's recommendation, would be sufficient but not greater than necessary to serve the goals of sentencing under Section 3553(a).

## I.    The Nature and Seriousness of Manaf's Conduct and the Need for Just Punishment Warrant the Recommended Sentence

The defendant is a highly sophisticated international heroin trafficker who spent years trafficking narcotics; attempted to import massive quantities of heroin into the United States; and actually delivered a ten-kilogram sample of heroin for importation into the United States. As the defendant explained to the UC the very first time he called the UC, he had long "been after" a drug trafficking route into the United States, and was fully capable of supplying tons of poison into this country.   In so doing, the defendant partnered with a murderous terrorist organization, the Taliban, to protect his valuable drug shipments.   The defendant chose to deploy his connections within the Taliban, and to pay the Taliban for its drug-trafficking assistance, at a time of peak violence in the Taliban's terrorist insurgency—violence that plagued the Afghan people with death and destruction in a record number of terrorist attacks and thousands of casualties, and resulted in the collapse of their nation into the hands of the Taliban within just a few years.[5]   And even after being

---

[5] *See* Tr. 575, Testimony of Dr. Bacon ("2018 was a particularly violent year of the insurgency. The levels of violence had not really declined during the winter the way that they normally had. So it was a violent year.   There were a record number of attacks.   About 10,000 people were

16

arrested and extradited to the United States, even despite being incarcerated pending trial, the defendant directed the kidnapping and threatening of a critical witness at gunpoint.

The seriousness of the defendant's conduct is indisputable. The defendant delivered ten kilograms of heroin as a mere sample and agreed to move hundred-kilogram loads of heroin to the United States. Heroin is a devastatingly addictive, often lethal substance. Every dose of narcotics that the defendant attempted to distribute warrants punishment, and the wholesale quantities at issue in this case amount to thousands of individual doses and potential lives impacted. The defendant attempted to sell it in mammoth quantities, callously preying upon and perpetuating the addictions of users. When presented with the opportunity to sell such poison in the United States, the defendant seized it, taking the initiative to call the UC himself, noting how long he had been wanting to find a way to send drugs directly to the United States. (*See* GX 201B-T ("I have been after it so much, but I haven't been able to find a good person.")). The hours of meetings and calls recorded in this case reflect the defendant's enthusiasm for trafficking drugs, his greed to capitalize on human suffering, and his willingness to enlist a terrorist organization to ensure his scheme's successful execution. Indeed, the defendant paid the Taliban to put a special mark on his heroin that he designed—the Helmand 1—to ensure that his product was protected by the Taliban. There is similarly no question that the defendant made real profits from his offenses, which should be forfeited at sentencing.[6]

At the core of his conduct, Manaf attempted to supply massive quantities of heroin for importation into this country and enlisted the Taliban to help him do so. The defendant understood

---

killed that year. A little less than 4,000 of those were civilians. And there were attacks in all but one province of the country. So it was a really violent year of the insurgency.").

[6] In advance of sentencing, the Government will provide a proposed order of forfeiture.

17

that the Ten Kilo Shipment—which the defendant was informed had a street price of approximately $750,000—was merely a practice run intended to allow the UC's customers to assess the quality of the drugs in furtherance of a far larger (and more profitable) effort. The recordings make clear that Manaf intended and was prepared to supply hundreds of kilograms of heroin to the UC for sale in the United States.

The base offense level of 38, reserved for only the most serious and significant drug trafficking offenses, is plainly appropriate and reflects the scope of the defendant's conduct. The Probation Office reports that over the past five years, there have been only nine defendants in the entire federal system responsible for heroin trafficking with both an offense level and Criminal History Category on par with Manaf. (*See* PSR at 28 (excluding cooperating witnesses). This places the defendant within a small percentage of the most serious drug trafficking offenders in the federal system. Among those top offenders, the average length of imprisonment imposed was 337 months and the median length of imprisonment imposed was 408 months. (*Id.*) A sentence consistent with those figures is warranted to reflect the seriousness of the defendant's large-scale heroin trafficking, to provide just punishment for that dangerous and destructive conduct, and to promote respect for the law prohibiting that conduct.

Throughout the trial, Manaf claimed that he had not previously imported heroin into the United States. Even if true, that hardly diminishes the seriousness of his conduct. The DEA initiated an investigation into the defendant because he admitted to being a large-scale heroin trafficker with deep ties to, and support from, the Taliban. And, of course, the trial evidence repeatedly showed that, time and again, it was the *defendant* who took the initiative in the offense conduct. It was the *defendant* who called the UC in the first place to set up a heroin deal in the United States. It was the *defendant* who brought up the Taliban repeatedly regarding the security,

18

protection, and registration of his heroin loads. And it was the *defendant* who continually referenced his friendships and connections with high-ranking officials of the Taliban and the Haqqani Network, the latter of which he described as "his guys," whose operations are "sustained by our support." Trafficking in heroin anywhere causes genuine harm, and the Section 3553(a) factors are not limited to seeking to harm only U.S. persons by spreading the scourge of dangerous drugs. Nor could the claim that the defendant had not—yet—imported his poison into this country be a mitigating factor. It is instead a testament to the DEA's proactive efforts to protect the residents of this country from significant international narcotics traffickers based abroad. Indeed, had it not been the DEA that approached the defendant with the opportunity to traffic heroin to the United States that he so desperately longed for, it very well could have been another partner; and, then, this sentencing would be about the millions of doses of poison the defendant *actually* sent here, not merely that he tried and desperately wanted to send here. Against the backdrop of the defendant's history of drug trafficking with ties to and support from the Taliban, the fact that this was a sting operation is in no way mitigating in this case.

Moreover, the seriousness of the defendant's offense is underscored by his willingness to partner—and pay—a terrorist organization which has murdered thousands of U.S. soldiers, trampled on the human rights of millions of Afghanis, and terrorized the population of Afghanistan. Manaf partnered with this group because he knew the Taliban would keep his heroin safe. When asked who was securing his heroin labs, he said: "The Taliban. The Taliban. The Taliban." Manaf thus stands apart from the typical drug trafficker sentenced in this Court because of the company he kept in furthering his trafficking ambitions. It did not deter him that the group he paid to transport his drug loads within Afghanistan was an armed group with a long track record of bombings, suicide attacks, and assassinations. To the contrary, it was the Taliban's weaponry

19

and brutal tactics that made the group such an attractive partner for his drug trade, and it was the defendant's willingness to pay up that made him such an attractive partner to the Taliban. But combating this perilous symbiotic relationship is precisely the rationale for our nation's narco-terrorism laws. In introducing the narco-terrorism statutes underlying Counts Two and Three here, Senator Cornyn not only echoed the important nexus between drug traffickers and terrorists but also elaborated on this connection:

> This bill confronts the new reality and very real danger of the deadly mix of drug trafficking and terrorism . . . . Post 9/11, governments now find themselves combating classic terrorist groups that participate in, or otherwise receive funds from, drug trafficking in order to further their agenda. But whether narco-terrorists are actual drug traffickers who use terrorism against civilians to advance their agenda, or are principally terrorists who out of convenience or necessity use drug money to further their cause, the label of narco-terrorist may be equally applicable to both groups, and the full force of U.S. law should be brought to bear on these organizations.[7]

Manaf knew that his terrorist partners were "sustained by our support," and that the Haqqani Network's terrorist commanders couldn't "operate" without drug money. (Tr. 485.)[8] Manaf callously acted to aid their murderous missions for his own personal gain in the drug trade. In Manaf's view, the Taliban and its terrorist allies were "very good for our business." (GX 209C-T.) The seriousness of Manaf's narco-terrorism offenses thus warrants a significant sentence of incarceration in this case.

Finally, the defendant's willingness to kidnap, intimidate, and threaten a witness merits a serious and consecutive sentence to account for this additional brazen and heinous act he directed

---

[7] 151 CONG. REC. S9846 (daily ed. Sept. 8, 2005) (statement of Sen. Cornyn).

[8] This was not just perception, it was reality. As Dr. Bacon explained, the Taliban's violent insurgency was substantially funded by the heroin trade. (Tr. 450, Testimony of Dr. Bacon (noting that "[t]he Taliban has used the drug trade as a major source of revenue.").

20

from jail. The very nature of witness tampering is serious in its own right. It seeks to hamper the proper functioning of justice and sow fear in our criminal justice system. Manaf's efforts were directed at terrorizing a DEA confidential source and his family. He sought to send a message, from his cell in New York City, that would-be trial witnesses will suffer grave consequences if they dare cooperate with the U.S. Government—a message that is particularly receptive in a community haunted by the Taliban exacting recriminations against those working with the United States, as amply evidenced in the examples described above regarding the sources in this case.[9] In instigating and guiding a kidnapping at gunpoint, Manaf attempted to, and did, undermine efforts to hold the defendant accountable for serious crimes. A serious and consecutive sentence for these additional crimes is thus necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment.

## II. The Recommended Sentence Is Necessary To Afford Adequate Deterrence, and To Protect the Public

The recommended sentence is also necessary in order to adequately deter criminal conduct—in this case, large-scale international heroin trafficking that harms scores of Americans while supporting a terrorist organization—and to protect the public from such destructive conduct. *See* 18 U.S.C. §§ 3553(a)(2)(A)-(C). The application of the so-called "terrorism enhancement" here, at U.S.S.G. § 3A1.4(a) (*see* PSR ¶ 65), "reflects Congress's and the [Sentencing] Commission's policy judgment 'that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of

---

[9] WASHINGTON POST: *Taliban hunting for 'collaborators' in major cities, threat assessment prepared for United Nations warns* (Aug. 20, 2021), https://www.washingtonpost.com/world/2021/08/20/taliban-hunt-collaborators-united-nations/.

time.'" *See United States v. Stewart*, 590 F.3d 93, 172-73 (2d Cir. 2009) (Walker, J., concurring in part and dissenting in part) (quoting *United States v. Meskini*, 319 F.3d 88, 91-92 (2d Cir. 2003)). Deterring such conduct is particularly necessary when, as here, terrorist groups engage in narcotics trafficking to fund their murderous activities and when the economic incentives to sell drugs to the United States are so great, particularly for people such as Manaf, who live in parts of the world where heroin is comparatively plentiful and generates a huge profit margin. A significant sentence is necessary to afford adequate specific and general deterrence to large-scale heroin narco-terrorism, and to protect the public from further narcotics trafficking and violent threats by this defendant in the future.

The need to afford adequate general deterrence is particularly important in light of the international component of this case. The evidence at trial made plain that Manaf could be apprehended only by a sensitive and high-risk operation conducted by the DEA. Numerous witnesses took intense risks in order to collect crucial evidence of the defendant's crimes, and as set forth above, several of those witnesses have been threatened as a result of their work on this case, both by the defendant, and by the Taliban with reference to the defendant's prosecution.[10] As Judge Liman recently observed in sentencing a defendant convicted of a large-scale narcotics importation conspiracy: "These are hard crimes to detect. They involve a lot of law enforcement resources. It's difficult to make arrests. For every person who is caught, there are numerous others who are not, and so it is important that when somebody is convicted of importation of cocaine into the United States that the sentence is an extremely serious one." *United States v. Palacio Mena*, 22 Cr. 121 (LJL) (Dkt. 94, Tr. 30-31) (Apr. 11, 2024). If overseas heroin traffickers—who account

---

[10] A third witness (CS-4) was kidnapped by the Taliban and held captive for five months, until he finally escaped, because of his work for the U.S. Government. He continues to suffer from the physical trauma caused by his captivity.

for a large fraction of the heroin that is ultimately sold to users in this country—perceive that, even if they are arrested and charged by U.S. authorities, they are likely to receive a significant break at sentencing, they will not be deterred from importing their heroin into this country, where demand and prices are alluring.  It is crucial for similarly situated others to know that the consequences for such conduct are serious and that they will be brought to justice in the United States.  And it is important for the public to know that those who seek to traffic large quantities of heroin on our shores, and collaborate with terrorists to do so, will face serious punishment preventing them from causing harm to society.  The sentence imposed should thus send the strong, clear message that trafficking in heroin—a particularly addictive and often lethal substance that is causing overdose deaths in this country and around the world with tragic frequency—will not be tolerated, and that drug dealers such as the defendant who sell such poison, and thus make money by placing other people's lives at risk, will face significant consequences when they are caught.

A substantial sentence of incarceration is also necessary to deter and prevent the defendant from continuing to engage in narco-trafficking in support of the Taliban and from continuing to threaten witnesses.  The facts adduced at trial established that the defendant's participation in multi-ton quantity cross-border narcotics deals, which ultimately led to his arrest, was neither a fluke nor a first-time occurrence. The defendant admitted that he has trafficked kilograms of narcotics to countries around the world.  During his meetings with the UC, the defendant repeatedly detailed his production and distribution capabilities, demonstrating his sophistication and experience in the international narcotics trafficking arena.  Tellingly, the defendant had the means, and did not hesitate, to travel to Estonia in furtherance of the importation business with the UC.  Even from within prison, the defendant has continued to pose a danger to society by directing threats against witnesses.  The defendant's possession and use of a contraband cellphone in prison

23

clearly demonstrate that he continues to seek to evade monitoring of his calls and detection of his activities. And his prison communications demonstrate that his network on the outside remains intact and at his command. Incarceration is the only means to restrain—or at least limit—the threat that the defendant poses to the public and the safety of others.

Notably, the defendant was not deterred from financially supporting and partnering with the Taliban even after being sanctioned by OFAC. To the contrary, he was emboldened and used his blacklisting as a means of establishing credibility for his narcotics business. Nor was he deterred once he was arrested and extradited to the United States. Instead of ceasing his criminal conduct, he then intimidated a witness, directing his family to kidnap the witness and threaten the witness and the witness's family. A substantial sentence of incarceration is thus necessary to deter the defendant from continuing to engage in narco-terrorism and witness tampering offenses—especially since the defendant will likely be deported back to Afghanistan upon his release from prison, where law enforcement will have limited ability to prevent him from continuing his drug trafficking conduct and exacting revenge on the families of those who testified against him.

Against that backdrop, as the Court is aware, courts in this District have consistently imposed significant sentences in large-scale importation conspiracies, reflecting the incredibly serious nature of these offenses even without the direct involvement of terrorist groups like the Taliban. Here, Manaf faces a 20-year mandatory minimum sentence as a result of his narco-terrorism offenses, and the extreme aggravating factor of partnering with the Taliban, a known terrorist organization actively engaged in a violent insurgency slaughtering civilians. But even in cases where such aggravating facts, and their attendant mandatory minimums, are absent, courts in this District have frequently imposed sentences in the range of 15 to 20 years for large-scale drug importation conspiracies alone. *See, e.g.*, *United States v. Munoz Gallon*, 22 Cr. 357 (KPF),

24

Dkt. 36 (imposing 180-month sentence after guilty plea for defendant who brokered 3-kilogram cocaine deal in furtherance of ton-quantity cocaine importation conspiracy); *United States v. Palacio Mena*, 22 Cr. 121 (LJL), Dkts. 83, 86 (imposing 168-month sentences after guilty pleas for two defendants who brokered 5-kilogram cocaine deal in furtherance of ton-quantity cocaine importation conspiracy); *United States v. Rodriguez Tapia*, 22 Cr. 532 (GHW), Dkts. 80, 101 (imposing 162-month sentences after guilty pleas for two defendants who brokered 12-kilogram cocaine deal and proposed weapons purchase in furtherance of ton-quantity kilogram cocaine importation conspiracy); *United States v. Gorgeech*, 21 Cr. 559 (SHS), Dkt. 68 (imposing 240-month sentence where defendant, a native of Pakistan, provided confidential sources with a seven-kilogram sample of heroin from his laboratory in Afghanistan, assured the confidential source that he could arrange for 1,000 kilograms of heroin, and then received payment of $35,000 for the seven-kilogram heroin sample); *United States v. Balouchzehi*, 21 Cr. 658 (JMF), Dkt. 110 (imposing 240-month sentence where defendant, a native of Iran, arranged for a courier in Mozambique to provide a two-kilogram sample of heroin for delivery to the United States, later described during in-person meetings in Kenya with an undercover agent and confidential source how he was a leader in a drug trafficking organization that had distributed drugs around the globe for years, and discussed providing 500-kilogram loads and as much as two or three tons that year); *United States v. Campo Flores & Flores de Freitas*, S2 15 Cr. 765 (PAC), Dkts. 191-92 (imposing 216-month sentences upon two nephews of Venezuela's first lady, who devised a plan to work with the FARC members to import over 800 kilograms of cocaine from Venezuela to the United States); *United States v. Khan*, 16 Cr. 840 (LGS) (imposing 180-month sentence where 71-year-old defendant, a native of Pakistan, agreed to transport tens of thousands of kilograms of heroin to New York City and provided a five-kilogram sample of heroin); *United States v. Younes and*

25

*Gomez*, 18 Cr. 262 (VEC) (imposing 120-month sentences where 74- and 76-year-old defendants, natives of Colombia, brokered and provided a five-kilogram sample of cocaine and conspired to transport many tons more); *United States v. Abdalla*, 14 Cr. 716 (VM) (imposing 300-month sentence for Kenyan organized crime leader convicted of narcotics, weapons, and obstruction offenses).  In comparison, Manaf's narco-terrorism conduct warrants a sentence in excess of the applicable mandatory minimum of 20 years to provide just punishment, and to avoid sentencing disparities with defendants whose drug-trafficking lacked a terrorism nexus. For the same reasons, Manaf's outrageous attempt to threaten the life of a witness in this case should be met with a substantial sentence, to run consecutively to his other crimes.

### III.    The Defendant's History and Characteristics Favor the Recommended Sentence

Finally, the history and characteristics of the defendant speak to the need for the recommended sentence.  *See* 18 U.S.C. § 3553(a)(1). The defendant—in addition to describing certain difficulties in his life—reported to the Probation Office: "I was loved very much, I had a good upbringing, we had a very good living standard."  (PSR ¶ 81).  And the evidence presented at trial demonstrated that the defendant was a man of power, influence, access, and wealth.  He lived in a large compound in Kandahar.  He was protected by heavily armed guards.  He had contact with many influential Afghani leaders.  And he ran a hawala network that could move money around the world.  As this Court knows, many of the individuals charged in narcotics trafficking cases are in far more desperate circumstances than the defendant.  Manaf did not commit the instant crimes because of a lack of other opportunities or support.  Rather, the defendant was motivated by greed.  The defendant's status and position in Afghanistan prior to his involvement in the instant criminal activities counsel in favor of a substantial sentence.

The defendant's prior criminal conduct is also relevant to his history and characteristics. This was not the defendant's first foray into narcotics trafficking. In his conversations with the UC, he repeatedly cited his past experience as a drug trafficker and discussed heroin deals in Pakistan, Tanzania, Iran, and Mozambique, among other countries, in order to establish his standing as a narcotics trafficker, as well as to solicit possible future business from the UC. For example, the defendant told the UC, "I have spent my entire life in rice," and "Everybody knows that I am in the line of rice." (GX 601M-T). The defendant proudly admitted, to the UC and CS-1, the extensive reach of his DTO and the sophisticated methods by which he trafficked narcotics around the globe. These factors speak loudly to the need for a lengthy sentence.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that a substantial sentence of at least 35 years of imprisonment is appropriate for Manaf, and sufficient but not greater than necessary to serve the purposes of sentencing set forth in Title 18, United States Code, Section 3553(a).

Dated:     New York, New York
           December 6, 2024

                              Respectfully submitted,

                              DAMIAN WILLIAMS
                              United States Attorney


                         By: _____/s/_____
                              Sam Adelsberg
                              Nicholas S. Bradley
                              Kimberly J. Ravener
                              Assistant United States Attorneys
                              (212) 637-2494 / 1581 / 2358

Cc: Counsel of Record (by ECF)

27