# EXHIBIT A

*United States v. Manaf*, S1 18 Cr. 762 (JSR)
**October 11, 2024**

| ¶# | PSR Paragraph | Defense Objection | Government Response |
|---|---|---|---|
| **Data** | Dependents: 20 | The number of Dependents should be revised from 20 to 22 to reflect that Mr. Manaf has two wives and 20 children. See PSR ¶ 82. | No objection. |
| **2** | Count 1 charges that from at least January 2018, up to and including October 2018, in the Southern District of New York and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular state or district, HAJI ABDUL SATAR ABDUL MANAF (MANAF), a/k/a "Haji Abdul Sattar Barakzai," who was first brought to and arrested in the Southern District of New York, imported a controlled substance into the United States and into waters within a distance of 12 miles of the coast of the United States, from a place outside thereof in violation of 21 U.S.C. §§ 959(a) and 963. The controlled substance involved in the offense was one kilogram and more of heroin, in violation of 21 U.S.C. §§ 812, 960(a)(3), and 960(b)(1)(A). | Paragraph 2 should be revised to reflect that Count One of the Superseding Indictment charged Mr. Manaf with attempted distribution of one kilogram or more of heroin into the United States, not the completed offense. The paragraph should read in relevant part, ". . . HAJI ABDUL SATAR ABDUL MANAF (MANAF), a/k/a "Haji Abdul Sattar Barakzai, who was first brought to and arrested in the Southern District of New York, attempted to import a controlled substance into the United States . . . ." | No objection. |
| **4** | Count 3 charges that from at least January 2018, up to and including October 2018, in Afghanistan and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular state or district, MANAF, who was first brought to and arrested in the Southern District of New York, manufactured, distributed, and possessed with intent to distribute and manufacture one kilogram or more of | Paragraph 4 should be revised to reflect that Count Three of the Superseding Indictment charged Mr. Manaf with attempted drug trafficking while attempting to provide something of pecuniary value the Haqqani Network, not the completed offense. The paragraph should read in relevant part, ". . . MANAF, who was first brought to and arrested in the Southern District of New York, attempted to manufacture, distribute, and possess with intent to distribute and manufacture one kilogram or more of heroin . . . ." | No objection. |

*United States v. Manaf*, S1 18 Cr. 762 (JSR)
**October 11, 2024**

| | | | |
|---|---|---|---|
| | heroin, knowing and intending to provide something of pecuniary value to the Haqqani Network and its members, having knowledge that said persons and organizations have engaged in terrorism and terroristic activity, which violates the criminal laws of the United States, occurs in and affects foreign commerce, and causes and is designed to cause death and serious bodily injury to nationals of the United States while nationals are outside of the United States.<br>(21 U.S.C. §§ 960a(a), 960a(b)(1), 960a(b)(2), 960a(b)(3), 960a(b)(5), and 959(d), and 18 U.S.C. §§ 3238 and 2) | | |
| 5 | Count 4 charges that from at least February 2019, up to and including April 2019, in the Southern District of New York and elsewhere, MANAF, while incarcerated at the Metropolitan Correctional Center (MCC) in New York, New York, directed others to kidnap and rob a witness in Afghanistan to influence, delay, and prevent that witness's testimony, with respect to the prosecution of the offenses charged in Counts One through Three of this Superseding Indictment.<br>(18 U.S.C. §§ 1512(a)(2), 1512(h), and 1512(k)) | Paragraph 5: Paragraph 5 should be revised to reflect that Count Four of the Superseding Indictment charged Mr. Manaf with conspiracy to commit witness tampering, not the substantive offense. The paragraph should read in relevant part, ". . . MANAF, while incarcerated at the Metropolitan Correctional Center (MCC) in New York, New York, intentionally and knowingly combined, conspired, and confederated and agreed together and with each other to kidnap and rob a witness in Afghanistan to influence, delay, and prevent that witness's testimony . . . ." | No objection to clarifying that Count Four was a conspiracy. |
| 6 | Count 5 charges that from at least February 2019, up to and including April 2019, in the Southern District of New | Paragraph 6 should be revised to reflect that Count Five of the Superseding Indictment charged Mr. Manaf with aiding and abetting witness tampering. The paragraph | The Government does not agree that the defendant was only charged with "aiding and abetting |

*United States v. Manaf*, S1 18 Cr. 762 (JSR)
**October 11, 2024**

|  |  |  |  |
|---|---|---|---|
|  | York and elsewhere, MANAF, while incarcerated at the Metropolitan Correctional Center (MCC) in New York, New York, directed and attempted to direct others to kidnap and rob a witness in Afghanistan to influence, delay, and prevent that witness's testimony, with respect to the prosecution of the offenses charged in Counts One through Three of this Superseding Indictment. (18 U.S.C. §§ 1512(a)(2), 1512(h), and 2) | should read in relevant part, ". . . MANAF, while incarcerated at the Metropolitan Correctional Center (MCC) in New York, New York, directed and attempted to direct others to kidnap and rob a witness in Afghanistan, and aided and abetted the same, to influence, delay, and prevent that witness's testimony . . . ." | witness tampering." The paragraph accurately summarizes the "to wit" clause of Count Five, and the aiding and abetting statute is listed at the end of the paragraph as currently written. |
| 11 | The Taliban is a terrorist organization based in Afghanistan. The Taliban has engaged in a public insurgency campaign to regain control of Afghanistan since losing power in 2001, as a result of the U.S. and NATO-led invasion of Afghanistan, which is also known as Operation Enduring Freedom-Afghanistan. As part of this campaign, the Taliban conducted numerous suicide bombings, targeted killings, assassinations, and hostage takings against the Afghanistan government, U.S. military forces, and American civilians. The Taliban often publicly accept responsibility for these attacks through public statements issued to the media or posted online. The Taliban has claimed responsibility for the following acts of terror, among others: (a) In October 2012, in the Helmand Province, the Taliban killed six police | Paragraph 11 should be revised to state: The Taliban is an Islamic extremist organization based in Afghanistan. The Taliban engaged in a public insurgency campaign to regain control of Afghanistan after losing power in 2001, as a result of the U.S. and NATO-led invasion of Afghanistan, which is also known as Operation Enduring Freedom-Afghanistan. As part of this campaign, the Taliban conducted numerous suicide bombings, targeted killings, assassinations, and hostage takings against the Afghanistan government, U.S. military forces, and American civilians. The Taliban often publicly accepted responsibility for these attacks through public statements issued to the media or posted online. This edit is necessary to align with the trial evidence, including most notably the testimony of the government's expert witness, Dr. Tricia Bacon. Specifically, Dr. Bacon testified that the Taliban is "an Afghan Islamic extremist organization that has, at times, governed Afghanistan." Tr. 445:24-446. She also testified that the Taliban insurgency ended in August 2021, when the Taliban took power as the government of Afghanistan. See Tr. 451:14-15; 536:19-24; 579:10-14; 580:10-19. The details in Paragraph 11(a)-(e), | The Government has no objection to modifying the paragraph to note that the Taliban took control of Afghanistan in August 2021. Otherwise, the language should remain as written. The Court is entitled to consider the full extent of the Taliban's historical conduct, including acts of terrorism, in considering the defendant's narcoterrorism conviction on Count Two. Such information is not limited to the trial record for the purposes of sentencing. |

*United States v. Manaf*, S1 18 Cr. 762 (JSR)
**October 11, 2024**

| | | |
|---|---|---|
| officers in an "insider" attack, carried out by Taliban members posing as members of the Afghanistan police. In claiming responsibility for the attack, a Taliban spokesman stated that the Taliban carried out the attack using a "mujahid who had infiltrated and penetrated the police ranks."<br><br>(b) In June 2013, the Taliban launched a rocket attack against coalition forces at Bagram Air Base, outside of Kabul. The attack killed four American soldiers.<br><br>(c) In May 2015, a Taliban suicide bomber detonated a car bomb near the airport in Kabul, hitting a vehicle used by European Union police advisory officials. Three people were killed, including one British security contractor.<br><br>(d) In May 2015, a Taliban gunman opened fire at a guesthouse in an upscale area of central Kabul frequented by foreigners. The assault lasted five hours and killed 14 people, including an American. In claiming responsibility for the attack, a Taliban spokesman stated, "[t]he occupying forces should realize that they are not safe from our attacks under any cover or in any location."<br><br>(e) In August 2018, a Taliban suicide bomber detonated a bomb outside a U.S. air base in Parowan Province, Afghanistan, killing three NATO soldiers and wounding one American soldier. | along with the preceding sentence, should be removed because evidence of these events was not presented at trial and is not part of the offense conduct for the crimes with which the defendant was charged. | |

*United States v. Manaf*, S1 18 Cr. 762 (JSR)
**October 11, 2024**

| 12 | On September 7, 2012, the U.S. Secretary of State designated the Haqqani Network as a Foreign Terrorist Organization. The Haqqani Network, which is sometimes referred to as the "Network" or the "Miram Shah Taliban," is a terrorist organization based in southeastern Afghanistan that is aligned with the Taliban. The leadership of the Haqqani Network is based primarily in Miram Shah, an area in Waziristan in the Federally Administered Tribal Areas near southeastern Afghanistan and a neighboring country. Since 2001, the Haqqani Network has sought to drive the U.S. led coalition forces out of Afghanistan, in order to re-establish Taliban rule. As part of this campaign, the Haqqani Network has conducted numerous suicide bombings, targeted killings, assassinations, and high-profile hostage takings against the Afghanistan government, U.S. military forces, and American civilians. In furtherance of this campaign, the Haqqani Network has claimed responsibility for the following acts of terror, among others:<br><br>(a) In March 2008, the Haqqani Network launched a suicide bombing in the Khost Province, which killed two members of the International Security Assistance | Paragraph 12 should be revised to state:<br><br>On September 7, 2012, the U.S. Secretary of State designated the Haqqani Network as a Foreign Terrorist Organization. The Haqqani Network, which is sometimes referred to as the "Network" or the "Miram Shah Taliban," is an Islamic extremist organization based in southeastern Afghanistan that is aligned with, and part of, the Taliban. The leadership of the Haqqani Network is based primarily in Miram Shah, an area in Waziristan in the Federally Administered Tribal Areas near southeastern Afghanistan and a neighboring country. In 2001, the Haqqani Network sought to drive the U.S. led coalition forces out of Afghanistan, in order to re-establish Taliban rule. As part of this campaign, the Haqqani Network conducted numerous suicide bombings, targeted killings, assassinations, and high-profile hostage takings against the Afghanistan government, U.S. military forces, and American civilians.<br><br>This edit is necessary to align with the trial evidence, including most notably the testimony of the government's expert witness, Dr. Tricia Bacon. Specifically, Dr. Bacon testified that the Haqqani Network is "an Afghan Islamic extremist organization that has been a faction within the Taliban for part of its history." Tr. 446:22-24; see also Tr. 534:22-538:2. She also testified that the Taliban insurgency ended in August 2021, when the Taliban took power as the government of Afghanistan. See Tr. 451:14-15; 536:19-24; 579:10-14; 580:10-19. The details in Paragraph 12(a)-(c), along with the preceding sentence, should be removed because evidence of these events was | The Government believes the language should remain as-is. The Court is entitled to consider the full extent of the Haqqani Network's historical conduct, including acts of terrorism, in considering the defendant's attempted narcoterrorism conviction on Count Three. Such information is not limited to the trial record for the purposes of sentencing. |

*United States v. Manaf*, S1 18 Cr. 762 (JSR)
**October 11, 2024**

| | | | |
|---|---|---|---|
| | Force ("ISAF"), the NATO security mission in Afghanistan.<br><br>(b) In November 2008, members of the Taliban kidnapped an American journalist, and transferred him to the custody of the Haqqani Network, who held him in captivity until June 2009.<br><br>(c) In September 2011, the Haqqani Network launched a military assault on the U.S. Embassy and ISAF headquarters in Kabul, Afghanistan, resulting in the deaths of at least sixteen Afghanistan citizens. | not presented at trial and is not part of the offense conduct for the crimes with which the defendant was charged. | |
| 22 | MANAF again told the UC that he was on the "blacklist," and explained that the "Treasury of America" placed him on the "blacklist" because of his money-changing business, "Haji Khairullah and Abdul Sattar." MANAF told the UC that the Americans claimed that MANAF was "help[ing] the Taliban." MANAF told the UC: "I was a money-changer, what difference does it make to me? In whose forehead is it written that one is a Taliban [?]'' MANAF told the UC that this issue had "caused me a loss of 20 million dollars." | Paragraph 22 should be deleted because the Court granted Mr. Manaf's motion to exclude from evidence references to OFAC sanctions and Mr. Manaf's statements about being on the "blacklist" of America, and they are irrelevant to the offense conduct. Tr. 3:25-4:5. | The language should remain as drafted. The preclusion of certain evidence at trial does not limit the Court's ability to consider relevant conduct at sentencing. *See also* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."). That the defendant was previously sanctioned for his financial support of the Taliban and that he thereafter participated in |

*United States v. Manaf*, S1 18 Cr. 762 (JSR)
**October 11, 2024**

| | | | narcoterrorism crimes to benefit the Taliban is highly relevant for the Court's consideration of the Section 3553(a) factors. |
|---|---|---|---|
| 46 | As described in the following paragraphs below, after MANAF's arrest and extradition for the charged offenses on February 6, 2019, and while incarcerated at the Metropolitan Correctional Center ("MCC") in New York, MANAF directed members of his family in Afghanistan to kidnap and intimidate CS-1 (the DEA confidential source) in an effort to silence him, which turned into a years-long campaign of intimidation by MANAF's co-conspirators against the DEA's sources in this case and their families. | The statement in Paragraph 46, "which turned into a years-long campaign of intimidation by MANAF's co-conspirators against the DEA's sources in this case and their families" should be revised to read, "which was followed by intimidation by MANAF's family members against certain of the DEA's sources in this case and their families over the course of several years." | The language should remain as drafted. The defense provides no justification or authority for the suggested change. |
| 49 | During CS-1's kidnapping, members of MANAF's family assaulted CS-1 and threatened his life. In particular, after MANAF dialed into the interrogation, MANAF's brother seized CS-1's phone. Then, while one family member held CS-1's arms, another family member punched CS-1 in the face. MANAF's brother then asked his son to bring his Kalashnikov into the room so that he could kill CS-1. MANAF's brother told CS-1 "You're an American spy, I'm going to shoot you. I'm going to kill you." However, after CS-1's uncle (who was also present) intervened, MANAF's brother finally agreed to let CS-1 leave—after CS-1 was | The fourth sentence of Paragraph 49 should be revised to read, "According to CS-1's testimony at trial, MANAF's brother then asked his son to bring his Kalashnikov into the room and told CS-1 to sit down and shut up," which aligns with the trial testimony. See Tr. 703:5-7. | The language should remain as drafted. The paragraph and trial record amply support that CS-1 was assaulted and threatened at gunpoint. It bears noting that by returning a guilty verdict on the witness tampering counts, the jury clearly found CS-1's testimony to be credible. |

*United States v. Manaf*, S1 18 Cr. 762 (JSR)
**October 11, 2024**

| | | | |
|---|---|---|---|
| | held against his will for many hours—if CS-1 agreed to bring them the UC. Before CS-1 was allowed to leave, MANAF's brother told CS-1 that if CS-1 did not bring the UC or the UC's family "I will kill you or your family, your father, or brother or son, anyone." MANAF's family did not return CS-1's phone, but allowed a member of CS-1's family to pick it up at a later date. | | |
| 51 | HAJI ABDUL SATAR ABDUL MANAF was an Afghanistan-based drug trafficker who (1) attempted to import at least 90 kilograms of heroin into the United States, (2) used firearms in furtherance of the drug trafficking activities, (3) used the proceeds of heroin trafficking to benefit the Taliban, (4) attempted to use the proceeds of heroin trafficking to benefit the Haqqani Network, and (5) tampered with a witness by arranging the kidnaping and threatening of him/her. Specifically, MANAF has participated in in-person meetings and telephone calls, and has exchanged electronic communications with individuals whom MANAF understood to be affiliated with international drug trafficking organizations. During those meetings, MANAF helped arrange to import heroin into the United States with the assistance of, and recognizing that some of the proceeds of that narcotics trafficking | The statement in Paragraph 51 that Mr. Manaf "(2) used firearms in furtherance of the drug trafficking activities" should be revised to "(2) stated that the Taliban made drug deliveries while armed" to align with the trial testimony. Although there was evidence at trial that Mr. Manaf understood the Taliban delivered drugs while armed, see GX 206B-T; GX 601I-T, there was no evidence that Mr. Manaf himself used firearms in furtherance of the drug trafficking activities. This change would be consistent with Paragraph 61 of the PSR, which added two levels to the Base Offense Level because "[a] firearm was possessed in connection with the drug trafficking offense as the Taliban (associates of the defendant) made drug deliveries while armed." | The paragraph should remain as drafted. The trial record shows that the defendant's home was protected by guards with multiple firearms during a meeting with DEA confidential sources where the defendant discussed providing support to the Haqqani Network and the defendant's planned heroin business with the UC. (Tr. 480-85). |

*United States v. Manaf*, S1 18 Cr. 762 (JSR)
**October 11, 2024**

| | | | |
|---|---|---|---|
| | would go to the Taliban. MANAF also helped transfer what he had been advised were drug proceeds from Australia to Afghanistan, with the understanding that that money would be given to the Haqqani Network. After MANAF's extradition, he directed members of his family in Afghanistan to kidnap and intimidate CS-1 in an effort to silence him, kicking off a years-long campaign of intimidation by MANAF's co-conspirators against the DEA's sources in this case and their families. | | |
| **51 cont.** | | The statement in Paragraph 51 that Mr. Manaf "(3) used the proceeds of heroin trafficking to benefit the Taliban" should be revised to "(3) paid the Taliban to register a stamp connection with the drug trafficking activities." This change reflects evidence at trial that Mr. Manaf stated that he paid the Taliban to register a stamp for the heroin packages. See Tr. 181:8-184:15; 191:8-193:2; GX 206C-T; GX 207D-T. There was no evidence of other benefits provided to the Taliban. | This paragraph should reflect that the defendant paid the Taliban to facilitate his heroin trafficking business. For example, GX 209C-T reflects that the defendant coordinated his drug trafficking with the top Taliban official in Helmand province, the Administrative Governor, and paid that Taliban official for his assistance. The defendant repeatedly stated his intent to pay the Taliban for armed protection of his laboratories and drug loads, among other things. The defendant's conduct therefore was not limited to his payment to the Taliban for his drug stamp. |
| **60** | Base Offense Level: The guideline for a violation of 21 U.S.C. § 963 is USSG | The reference to "90 kilograms or more of heroin" in Paragraph 60 should be revised to "ten kilograms of | The paragraph should remain drafted as-is. The defense |

*United States v. Manaf*, S1 18 Cr. 762 (JSR)
**October 11, 2024**

| | | | |
|---|---|---|---|
| | §2D1.1. The defendant is accountable for at least 90 kilograms or more of heroin. As such, the base offense level is 38, pursuant to USSG §§2D1.1(a)(5) and §2D1.1(c)(1). | heroin" to align with the evidence at trial. The jury found that the amount of drugs was "one kilogram or more" for the guilty verdicts in Counts One through Three. Tr. at 1341:25-1342:20. Although there was evidence at trial that Mr. Manaf agreed to sell 1,500 kilograms of heroin to the DEA undercover agent, see Tr. 250:14-18; 293:3-14, Mr. Manaf completed the sale of only ten kilograms of heroin in August 2018. GX 101-110; GX S2. Moreover, there was evidence at trial that Mr. Manaf delivered the ten-kilogram sample of heroin approximately five months after he first discussed distributing a sample for the UC. See GX 202-T; Tr. 88:2-29:25. Absent evidence that Mr. Manaf was capable of supplying the vast quantities of heroin agreed upon, "the amount delivered more accurately reflects the scale of the offense." Application Note 5 to U.S.S.G. § 2D1.1(c)(3). Accordingly, the base offense level in Paragraph 60 should also be revised from 38 to 34. See U.S.S.G. § 2D1.1(c)(3). | concedes that the defendant agreed to sell 1,500 kilograms of heroin. Moreover, the defendant at various points demonstrated his ability and intention to supply far in excess of 90 kilograms of heroin. *E.g.*, ¶ 19 (describing how almost "80 pieces" were seized in Iran); ¶ 20 (describing how the defendant lost 200 kilograms of because someone "snitched"); ¶ 25 (offering to broker 1,800 kilogram heroin deal to UC); ¶ 28 (describing how he would convert beest into "around 100 to 150 items"). |
| 61 | Specific Offense Characteristics: A firearm was possessed in connection with the drug trafficking offense as the Taliban (associates of the defendant) made drug deliveries while armed. Pursuant to U.S.S.G. § 2D1.1(b)(1), two levels are added. | Paragraph 61, which states that "[a] firearm was possessed in connection with the drug trafficking offense as the Taliban (associates of the defendant) made drug deliveries while armed," should be deleted, and Mr. Manaf should not receive an enhancement for possession of a firearm in connection with the drug trafficking activity. The evidence at trial regarding the Taliban's use of firearms in connection with drug activity was limited to expert testimony about general practices, see Tr. 527:17-528:3, or potential drug transactions involving Mr. Manaf in the future, see GX 206B-T; GX 601I-T. However, there was no evidence at trial that members of the Taliban delivered the sample of heroin, nor that they did so while possessing firearms. | The paragraph should remain as drafted. There is ample evidence of firearms possession in this case, including firearms used to protect the defendant's drug business and to enforce threats against a witness who had exposed his drug business, as well as the defendant's knowledge of such firearms. The trial record also shows that the defendant's home was protected by guards with multiple firearms during a meeting with DEA confidential sources where the defendant discussed |

*United States v. Manaf*, S1 18 Cr. 762 (JSR)
**October 11, 2024**

| | | | |
|---|---|---|---|
| | | | providing support to the Haqqani Network and the defendant's planned heroin business with the UC. (Tr. 480-85). |
| 62 | Specific Offense Characteristics: The defendant's associates (Taliban and Haqqani Network) used threats of violence in furtherance of the drug trafficking activity. Pursuant to U.S.S.G. § 2D1.1(b)(2), because the defendant used violence, made a credible threat to use violence, or directed the use of violence, the offense level is increased by 2 levels. | Paragraph 62, which states that "[t]he defendant's associates (Taliban and Haqqani Network) used threats of violence in furtherance of the drug trafficking activity" should be deleted and Mr. Manaf should not receive an enhancement for violence or threats of violence. For the same reasons described above, there was no evidence at trial that the delivery of the ten kilograms of heroin involved use of weapons or threats of violence by the Taliban or Haqqani Network. | The paragraph should remain as drafted. The offense conduct is not limited to the delivery of ten kilograms of heroin. The defendant on multiple recorded conversations described how the Taliban were armed and provided security for his drug laboratory and the drug trafficking routes at issue. (GX 208C-T) (explaining the Taliban provide security for the drug laboratory). The defendant also understood the Taliban would fight anyone who threatened the drug trafficking routes, including with RPGs and machineguns. (GX 601I-T) ("They get the items; they load the items in 12 vehicles, ok? . . . With people, RPG, Daashaka, and all of the ammunitions . . . they fight tank or anything that comes, ok?"). Finally, the defendant also directed his family members to kidnap a witness who had exposed his drug business; that witness was later threatened at gunpoint and accused of being an "American spy." |

*United States v. Manaf*, S1 18 Cr. 762 (JSR)
**October 11, 2024**

| 75 | On June 29, 2012, OFAC sanctioned Manaf and his international money exchange business, Haji Khairullah Haji Sattar Money Exchange ("HKHS"), "for donating money and providing financial services to the Taliban" and added him to its list of Specially Designated Nationals and Blocked Persons, pursuant to Executive Order No. 13224. As a result of the OFAC designation, all property in the United States or in the possession or control of U.S. persons in which HKHS or Manaf had an interest was blocked, and U.S. persons were prohibited from engaging in transactions with Manaf or HKHS. During the course of the investigation, the defendant repeatedly told the UC that he was on the "blacklist of America," a reference to the defendant's designation by OFAC for his support to the Taliban. The defendant also explained that he had a "moneychanger shop by the name of Khairullah and Sattar" and that "[w]hen you see me in person, you will know me." OFAC's press release announcing the designation noted as follows: "[Manaf] has donated thousands of dollars to the Taliban to support Taliban activities in Afghanistan and has distributed funds to the Taliban using his hawala. As of 2010, [Manaf] provided financial assistance to the Taliban. As of late 2009, | Paragraph 75 should be deleted because the placement of Mr. Manaf on the "Specially Designated Nationals" list in 2012 by the U.S. Department of the Treasury's Office of Foreign Assets Control in connection with uncharged alleged money exchange services was a civil administration determination that does not constitute criminal conduct by Mr. Manaf. | The Government opposes deletion of this relevant paragraph. The Court can and should consider the OFAC designation as relevant conduct, regardless of whether it was a civil administrative determination. That the defendant was previously sanctioned for his financial support of the Taliban, and thereafter trafficked drugs to benefit the Taliban, is highly relevant for the Court's consideration of the Section 3553(a) factors. |

*United States v. Manaf*, S1 18 Cr. 762 (JSR)
**October 11, 2024**

| | | | |
|---|---|---|---|
| | [Manaf] provided tens of thousands of dollars to aid the Taliban's fight against Coalition Forces in Marjah, Nad'Ali District, Helmand Province, Afghanistan, and helped to transport a Taliban member to Marjah. As of 2008, [Manaf] and Khairullah collected money from businessmen and distributed the funds to the Taliban using their hawala." | | |
| 79 | Haji Abdul Satar Manaf was reportedly born in Helmand, Afghanistan, on August 11, 1965, to the union of Haji Abdul Manaf (age 80) and Bakht Bibi (deceased). The defendant's father resides in Pakistan and suffers from "senility" and possible dementia as he cannot remember his children's names and has mobility issues. The defendant's mother died 12 years ago in Pakistan when she was in her 70s from a heart attack. The defendant has 17 siblings who share the same last name as him, reside in Pakistan or Afghanistan, and enjoy good health (unless otherwise noted below). In age order: Haji Hakim (age 58), Khano (age 56), Zainabo (age 58), Haji Qayoum (age 52), Tajo (age 55), Abdul Halim (age 50), Mohammad Naim (age 46), Halimah (age 44), Pashtanah (age 43), Mohammed Amin (age 42), Wodood (age 40), Najibah (age 39) who suffers from throat cancer, Salimah (age 38), Karim (age 36), Rahimah (age 35), and Rakimah (age 33). The defendant also | The statement in Paragraph 79 that Mr. Manaf's "brothers work on the family farm (owned by the defendant's father)" should be revised to state that Mr. Manaf's "brothers derive income from crops grown on family land (owned by the defendant's father)." This change is necessary to accurately reflect the employment status of Mr. Manaf's family. | The requested phrase "derive income" is vague and it is unclear how that accurately reflects the defendant's family's employment status, why that is relevant to the PSR, or what factual support exists for the defendant's claims. |

*United States v. Manaf*, S1 18 Cr. 762 (JSR)
**October 11, 2024**

| | | | |
|---|---|---|---|
| | has one sibling, Naemat, who died at the age of 12 (approximately 35 years ago) after falling into a well. According to the defendant, all of his brothers work on the family farm (owned by the defendant's father), but females in Pakistan "do not work and are housewives only." His entire family is aware of his legal situation, and they have indicated to him that they remain supportive. | | |
| 80 | Manaf was raised in Afghanistan until the Soviet Union invaded in approximately 1979, and his father was arrested for political reasons where he was held as a prisoner for several months. Manaf's family moved to Pakistan at this time because the Soviet Union army burned their farm, killed their animals, and demolished their house. After Manaf's father was released from prison, the family settled in the suburbs of Pakistan "because there were still bombs near the cities," which is where Manaf was living with his two wives and children at the time he was charged with the instant offense. According to ICE records, the defendant entered the United States on February 9, 2019, and is an illegal alien subject to removal proceedings. As such, no home inspection was conducted and no collateral interview could be completed as all of the defendant's friends and family reside in Pakistan or Afghanistan. | The statement in Paragraph 80 that the Soviet Union army "burned their farm" should be revised to "burned their crops." | No objection. The Government notes, however, that Mr. Manaf represented on recorded conversations that his father had served in the Afghan parliament, and discussed his own powerful contacts within the Afghan government, the Taliban, and the Haqqani Network. The defendant further discussed his participation in the selection of Mullah Omar to lead the Taliban, as reflected in recorded conversation with the undercover agent in this case. |

*United States v. Manaf*, S1 18 Cr. 762 (JSR)
**October 11, 2024**

| 82 | Manaf has two wives and 20 children between them, who all live together in Pakistan on the family's farm. The extended family, including Manaf's siblings, share the income produced from the farm equally, which is how they have been able to support themselves without the defendant's assistance. However, the children can no longer attend school because they reportedly charge tuition in Pakistan, so the defendant's wives have been selling some property off to help earn money for their education. Manaf also explained that females in Pakistan only have one name and no last name, and all of his male children took on his surname. According to Manaf, he has a "great relationship with all of my children, I miss them a lot and was very involved in their upbringing." | The reference in the first sentence of Paragraph 82 to "the family's farm" should be revised to "the family's land." The statement in the second sentence of Paragraph 82 that Mr. Manaf's family "share the income produced from the farm equally" should be revised to state that Mr. Manaf's family "share the income derived from crops grown on family land." These changes are necessary to accurately reflect the employment status of Mr. Manaf's family. | No objection. |
|---|---|---|---|
| 93 | According to Manaf, when he was arrested in Estonia for the instant offense, he was heavily addicted to opium. He first smoked it in 2010, and smoked it every day up until his arrest. He commented that he went through some "bad" withdrawals while in prison in Estonia awaiting his extradition. | The reference to 2010 in Paragraph 93 should be revised to 2001 to accurately reflect when Mr. Manaf first smoked opium. | No objection. |
| 96 | From 2006 up to the defendant's arrest for the instant offense in 2018, he was the co-owner of Khairullah and Satar in Pakistan, and earned a varied income. This business started when the defendant began buying | Paragraph 96 should be revised to state: The defendant was the co-owner of the Haji Khairullah Haji Sattar Money Exchange, which ceased operations after it was sanctioned by OFAC in 2012. The defendant earned a varied income from his money exchange | The paragraph should remain as drafted. The defendant on multiple occasions described to the UC how he ran his money remitting service during the offense conduct, |

**United States v. Manaf, S1 18 Cr. 762 (JSR)**
**October 11, 2024**

| | | |
|---|---|---|
| items in Pakistan to sell at a profit in Iran, and in 2012, it turned into a "very profitable" money exchange business. | business, which initially did not make very much money but became "very profitable." Prior to his money exchange business, the defendant imported merchandise from Pakistan into Iran for approximately 6 years.<br>This edit is necessary to accurately reflect the different businesses operated by Mr. Manaf as part of his employment record. | which contradicts the defendant's claim that the business "ceased operations" in or about 2012. The Government submits that the trial evidence, including the defendant's own recorded admissions, makes clear that the defendant had been in the drug business for years prior to his arrest. |