UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>- v. -<br><br>HAJI ABDUL SATAR ABDUL MANAF,<br>a/k/a "Haji Abdul Sattar Barakzai,"<br><br>Defendant. | S1 18 Cr. 762 (JSR) |

**SENTENCING MEMORANDUM ON BEHALF OF
HAJI ABDUL SATAR ABDUL MANAF**

Arlo Devlin-Brown
Amanda Kramer
Lelia A. Ledain
Dean S. Acheson
Jacob T. Stark
**COVINGTON & BURLING LLP**
620 Eighth Avenue
New York, NY 10018
adevlin-brown@cov.com
akramer@cov.com
lledain@cov.com
(212) 841-1000

*Counsel for Haji Abdul Satar Abdul Manaf*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................ iv

PRELIMINARY STATEMENT .................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................................ 1

I.      Mr. Manaf's Personal History and Family in Afghanistan and Pakistan ........................... 1

      A.      Childhood ................................................................................................................ 1

      B.      Adulthood ............................................................................................................... 2

II.     Mr. Manaf's Good Deeds and Charitable Acts in His Community ..................................... 4

III.    Mr. Manaf's Medical Conditions and Treatment in Federal Custody ............................... 5

IV.     The Offense Conduct .......................................................................................................... 9

      A.      The Narcotics-Related Charges .............................................................................. 9

      B.      The Witness Tampering Charges .......................................................................... 11

ARGUMENT .............................................................................................................................. 12

I.      Applicable Law ................................................................................................................. 12

II.     Guidelines Calculation ..................................................................................................... 13

III.    The Remaining Sentencing Considerations Support a Sentence of No More than
        240 Months' Imprisonment ............................................................................................. 14

      A.      The Nature and Circumstances of the Offense, as well as the Need to
                Avoid Unwarranted Sentencing Disparities, Warrant Leniency. .......................... 14

            1.      Attempted Narcotics Importation ............................................................. 14

            2.      Drug Trafficking with Intent to Provide Financial Support to
                        Terrorism .................................................................................................. 16

            3.      Witness Tampering .................................................................................... 19

            4.      Avoidance of an Unwarranted Disparity Between Similarly-
                        Situated Defendants .................................................................................. 20

      B.      Mr. Manaf's History and Characteristics Warrant Leniency ................................ 25

C.      A Sentence at the Mandatory Minimum Will Achieve the Goals of Sentencing...................................................................................................... 30

CONCLUSION.................................................................................................................... 33

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Fernandez-Rodriguez v. Licon-Vitale,*
    470 F. Supp. 3d 323, 328 (S.D.N.Y. 2020)......................................................8, 29

*Gall v. United States,*
    552 U.S. 38, 50 (2007)...................................................................................13

*United States v. Bagcho,*
    F. Supp. 3d 60, 63–65 (D.D.C. 2015), *aff'd*, 923 F.3d 1131 (D.C. Cir. 2019)........................23

*United States v. Booker,*
    543 U.S. 220, 234 (2005)................................................................................13

*United States v. Cavera,*
    550 F.3d 180, 189 (2d Cir. 2008)......................................................................13

*United States v. Chavez,*
    710 F. Supp. 3d 227, 228, 234 (S.D.N.Y. 2024)..............................................8, 29, 33

*United States v. Colucci*, No. 23-CR-417, 2024 WL 3643857, at *3–6 (E.D.N.Y.
    Aug. 5, 2024) ............................................................................................8, 29

*United States v. E.L.,*
    188 F. Supp. 3d 152, 174 (E.D.N.Y. 2016) .........................................................33

*United States v. Gigliotti,*
    287 F. Supp. 3d 353, 354 (E.D.N.Y. 2023) .........................................................16

*United States v. Greene,*
    249 F. Supp. 2d 262, 267 (S.D.N.Y. 2003)..........................................................32

*United States v. Griffin,*
    No. 22 Cr. 408 (EK), 2024 WL 2891686, at *3 (E.D.N.Y. June 10, 2024) ............................8

*United States v. Hernandez,*
    No. 03 Cr. 1257 (RWS), 2005 WL 1242344, at *5–6 (S.D.N.Y. May 24,
    2005) .....................................................................................................32

*United States v. Khan,*
    853 Fed. App'x 743, 744–46 (2d Cir. 2021)........................................................16

*United States v. Lopez-Pena,*
    No. 10 Civ. 7381 DC, 2011 WL 1676286, at *1 (S.D.N.Y. May 2, 2011) ............................15

*United States v. Mohammed,*
    693 F.3d 192, 195–97 (D.C. Cir. 2012)..............................................................23

*United States v. Mohammed,*
   No. 06 Cr. 357 (CKK), 2021 WL 5865455 at *3, *12 (D.D.C. Dec. 9, 2021)..................23, 24

*United States v. Ruiz,*
   No. 04 Cr. 1146-03 (RWS), 2006 WL 1311982 at *3, *12 (S.D.N.Y. May 10,
   2006) ......................................................................................................................................32

*United States v. Saade,*
   No. S1 11 Cr. 111 (NRB), 2013 WL 6847034, at *1–2 (S.D.N.Y. Dec. 30,
   2013) ................................................................................................................................20, 21

*United States v. Saade,*
   No. S1 11 Cr. 111 NRB, 2012 WL 2878087, at *1 (S.D.N.Y. July 11, 2012)........................21

*United States v. Santana,*
   No. 22 Cr. 368 (VM), 2024 WL 2275037, at *2 (S.D.N.Y. May 20, 2024).............................8

*United States v. Suarez,*
   No. 11 Cr. 836 (KBF), 2014 WL 1998234, at *2–3 (S.D.N.Y. May 15, 2014),
   *aff'd*, 615 F. App'x 5 (2d Cir. 2015)......................................................................................15

*United States v. Willis,*
   322 F. Supp. 2d 76, 84–85 (D. Mass. 2004) ..........................................................................32

*United States v. Yaroshenko,*
   No. 09 Cr. 524 (JSR), 2021 WL 4267812, at *1 (S.D.N.Y. Sept. 18, 2021)...........................15

**Statutes**

18 U.S.C. § 2332d................................................................................................................................31

18 U.S.C. § 2339A...............................................................................................................................31

18 U.S.C. § 2339B...............................................................................................................................31

18 U.S.C. § 2339C...............................................................................................................................31

18 U.S.C. § 3553(a) .............................................................................................................12, 13, 33

18 U.S.C. § 3553(a)(1)....................................................................................................................14, 25

18 U.S.C. § 3553(a)(2)....................................................................................................................12, 30

18 U.S.C. § 3553(a)(6)...........................................................................................................................23

21 U.S.C. § 959......................................................................................................................................31

21 U.S.C. § 960(b).................................................................................................................................31

21 U.S.C. § 960a ................................................................................................................31

**Other Authorities**

Khudai Noor Nasar, *Taliban Cracks Down on 'Costly' Polygamy*, BBC (Jan. 14,
    2021), https://www.bbc.com/news/world-asia-55630097; ........................................2

B. Jaye Anno, Ph.D, et al., *Correctional Health Care, Addressing the Needs of
    Elderly, Chronically Ill, and Terminally Ill Inmates*, U.S. Dept. of Just. Nat'l
    Inst. of Corr., 9–10 (Feb. 2004),
    https://static.prisonpolicy.org/scans/nic/018735.pdf ............................................... 28

Office of the Inspector General, U.S. Dep't of Justice, The Impact of an
    Aging Inmate Population on the Federal Bureau of Prisons  1 (2016),
    https://oig.justice.gov/reports/2015/e1505.pdf .........................................................28

ACLU, *AT AMERICA'S EXPENSE: The Mass Incarceration of the Elderly* 28-29
    (June 2012),
    https://www.aclu.org/files/assets/elderlyprisonreport_20120613_1.pdf ................................27

United States Sentencing Comm'n, Older Offenders in the Federal
    System 55 (2022), https://www.ussc.gov./sites/default/files/pdf/research-and-
    publications/2022/20220726_Older-Offenders.pdf ..................................................32

*Information for Afghan Nationals*, U.S. Citizenship and Immigration Services
    (last updated Nov. 13, 2024),
    https://www.uscis.gov/humanitarian/information-for-afghan-nationals...................................2

Press Release, U.S. Treasury Dep't, *Treasury Targets Money Exchange Houses
    for Supporting the Taliban* (June 29, 2012),
    https://home.treasury.gov/news/press-releases/tg1627.............................................3

## PRELIMINARY STATEMENT

This memorandum is respectfully submitted on behalf of Haji Abdul Satar Abdul Manaf in advance of his upcoming sentencing.  Mr. Manaf is a 59-year-old, illiterate man who spent nearly all of his life in Afghanistan and Pakistan.  Mr. Manaf, who speaks only Pashto and Farsi, had never stepped foot in the United States until February 2019, when he was extradited on these charges.  At the time of sentencing, Mr. Manaf will have been incarcerated in federal prison for almost six years.

The crimes with which Mr. Manaf has been convicted are undeniably serious.  But so is the mandatory minimum sentence of twenty years' imprisonment.  A sentence at that minimum is sufficient to address Mr. Manaf's conduct, which is far less egregious than in similar prosecutions. A sentence of this length is also sufficient to accomplish the other goals of sentencing, when taking into consideration Mr. Manaf's age and extensive medical conditions, his productive contributions to his family and community in Afghanistan and Pakistan, and his conduct when compared to that of other defendants in similar cases.  A twenty-year sentence would sufficiently punish Mr. Manaf for his conduct while also offering him the hope—however slight—of returning home so that he may once more see his family.

## FACTUAL BACKGROUND

I.    **Mr. Manaf's Personal History and Family in Afghanistan and Pakistan**

A.    Childhood

Now 59 years old, Mr. Manaf was born on August 11, 1965 in Helmand, Afghanistan.  He is the eldest of 17 siblings, one of whom died at the age of 12, approximately 35 years ago, when Mr. Manaf was a young man.  Presentence Investigation Report ("PSR") ¶ 79.  Mr. Manaf and his siblings were raised by his father (Haji Abdul Manaf), who owned land containing crops from which the family derived their income, and his mother (Bakht Bibi), who was a housewife.  PSR

1

¶¶ 79–80.  Mr. Manaf's father later served in the Afghan parliament during the administration of former president Hamid Karzai.  PSR ¶ 80 n.3.

Mr. Manaf grew up in Afghanistan until the Soviet-Afghan War in 1979, which began when Mr. Manaf was only a teenager and had a profound effect on his life.  After the Soviet Union invaded Afghanistan, Mr. Manaf's father was arrested and held as a political prisoner for several months.  The Soviet army also attacked the land on which Mr. Manaf's family lived and derived income, including by burning their crops, killing their animals, and destroying their house.  PSR ¶ 80.  Mr. Manaf's family struggled financially for several months during this time.  PSR ¶ 81.  After Mr. Manaf's father was released from prison, his family moved to Pakistan to avoid the conflict.  PSR ¶ 80.  The war also prevented Mr. Manaf from attending school during his childhood.  As a result, he never learned to read and remains illiterate to this day.  He speaks only Pashto and Farsi.  PSR ¶ 95.

Despite growing up under these challenging circumstances, Mr. Manaf thinks fondly of his childhood due to his supportive family.  He recalled of his early life in Afghanistan, "I was loved very much, I had a good upbringing, we had a very good living standard."  PSR ¶ 81.  Even after the Soviet Union invaded Afghanistan and imprisoned his father, Mr. Manaf's family was able to afford basic necessities because his paternal uncle took care of the family.  PSR ¶ 81.

B.    Adulthood

Prior to his arrest, Mr. Manaf lived with his two wives and twenty children on family land in Pakistan.  PSR ¶ 82.[1]  Mr. Manaf married his first wife, Radigul, in the 1980s.  They had twelve

---

[1] Afghan law permits the practice of polygamy, which "has long been widespread in the Pashtun societies of Afghanistan and Pakistan."  Khudai Noor Nasar, *Taliban Cracks Down on 'Costly' Polygamy*, BBC (Jan. 14, 2021), https://www.bbc.com/news/world-asia-55630097; *see also Information for Afghan Nationals*, U.S. Citizenship & Immigr. Services (last updated Nov. 13, 2024), https://www.uscis.gov/humanitarian/information-for-afghan-nationals ("Polygamous marriages are legal under Afghan law . . . .").

children, two of whom died of cancer at the age of two. Radigul is currently receiving treatment for health issues. PSR ¶ 83. In the 1990s, Mr. Manaf married his second wife, Fatimah, with whom he had ten children. PSR ¶ 84. Mr. Manaf is a devoted father to his twenty children—who range in age from five to 42 years' old—the youngest of which, Nado, was born after Mr. Manaf's arrest over six years ago. PSR ¶¶ 83–84. He has struggled being apart from his children since his arrest, stating, "I miss them a lot and was very involved in their upbringing." PSR ¶ 82. Even while incarcerated in another part of the world, Mr. Manaf maintains a "great relationship with all of [his] children." PSR ¶ 82.

Since Mr. Manaf's arrest, his family has supported itself through income derived from crops grown on the family land in Pakistan, which is shared among Mr. Manaf's extended family, including his siblings.[2] To help earn tuition money for their children, Radigul and Fatimah have been selling property, but unfortunately, they have been unable to afford tuition to send their children to school in Mr. Manaf's absence. PSR ¶ 82. Not being able to attend school has caused Laibah, one of Mr. Manaf's daughters, to experience depression and dizzy spells. PSR ¶ 84.

The family's land is owned by Mr. Manaf's elderly father, who also lives with Mr. Manaf's family. At eighty years old, Mr. Manaf's father suffers from senility, possible dementia, and mobility issues. PSR ¶ 79. Mr. Manaf wishes to return home as soon as possible to be with his family. PSR ¶ 85.

---

[2] As a young man, Mr. Manaf imported merchandise from Pakistan into Iran. PSR ¶ 96; *see also* PSR ¶ 81. He later entered the money-exchange business and became the co-owner of the Haji Khairullah Haji Sattar Money Exchange ("HKHS"). PSR ¶ 96. In June 2012—approximately six years before the start of the offense conduct—Mr. Manaf was sanctioned by the U.S. Department of the Treasury's Office of Foreign Assets Control in connection with uncharged conduct, including the use of his money exchange services, alleged to have benefitted the Taliban. PSR ¶ 97; *see also* Press Release, U.S. Treasury Dep't, *Treasury Targets Money Exchange Houses for Supporting the Taliban* (June 29, 2012), https://home.treasury.gov/news/press-releases/tg1627.

## II.     Mr. Manaf's Good Deeds and Charitable Acts in His Community

As reflected in the attached letters of support for Mr. Manaf, he has had a lasting impact on a significant number of individuals and causes within his community.  Mr. Manaf's relatives describe him as "a person of exceptional kindness and humility," who has "never hesitated to offer his assistance," whether financial support or emotional encouragement.  Ex. 1 (Letter from Ahmed Khan, Mr. Manaf's relative).  For example, for years, Mr. Manaf paid for the education of his nephews in Lahore, Pakistan after it became too dangerous for them to live in Quetta due to ongoing violence.  Ex. 2 (Letter from Ahmed Khan, Mr. Manaf's nephew).

Mr. Manaf's generosity extends beyond just his family members.  Mr. Manaf is a well-respected member of his community in Afghanistan and Pakistan, with a deep commitment to charitable work.  For example, he has funded educational initiatives, including the building of a primary school in a rural village in Balochistan, Afghanistan.  Ex. 3 (Letter from Saifullah, Mr. Manaf's son); *see also* Ex. 4 (Letter from Khalid Jan, Mr. Manaf's relative) ("Abdul Sattar's contributions to the field of education are unparalleled. He firmly believed that education is the key to broadening one's perspective and understanding the world from different angles. His tireless efforts to improve educational opportunities for everyone have left an indelible mark on our community.").  Mr. Manaf's charitable works also include funding a health clinic in Afghanistan and providing financial aid to struggling families.  Ex. 3 (Letter from Saifullah); *see also* Ex. 1 (Letter from Ahmed Khan) ("He has helped families build homes, funded weddings for those who couldn't afford them, and ensured that many children received the education they deserved.").

Beyond his charitable works, Mr. Manaf is well respected in his community for helping others peacefully resolve disputes.  *See* Ex. 3 (Letter from Saifullah) ("He has served as a trusted mediator and arbitrator in our community for years, stepping in to peacefully resolve issues that could have easily escalated."); Ex. 1 (Letter from Ahmed Khan) ("He has been a voice of wisdom

4

and peace, often mediating conflicts and helping others find common ground."). For example, Mr. Manaf helped resolve a land dispute between two families that "that risked dividing the entire community" by meeting with each family and "brokering a fair solution that satisfied everyone involved." Ex. 3 (Letter from Saifullah).

Mr. Manaf is also a devout Muslim, and, since his incarceration at the MDC, he has become in charge of the "call to prayer" for practicing Muslims at the facility. PSR ¶ 85.

### III.    Mr. Manaf's Medical Conditions and Treatment in Federal Custody

Mr. Manaf currently suffers from multiple severe and inadequately-treated medical conditions that require ongoing monitoring, treatment, and medication. Most notably, Mr. Manaf has suffered chronic back pain since his arrest in 2018, when three Estonian law enforcement officers tackled him, injuring his back and breaking his right thumb. PSR ¶ 88. As early as mid-2019, Mr. Manaf's medical records show that he suffered from "low back pain" as well as "[n]euralgia and neuritis" (*i.e.*, nerve pain and inflammation). Dkt. 105 (Def's Sept. 20, 2023 Letter to the Court Seeking Medical Evaluation and Treatment), at 1 (citing Excerpts of Manaf Medical Records).[3] In March 2021, an x-ray of Mr. Manaf's lumbar spine showed "slightly progressed degenerative disc change" as compared to an x-ray that had been performed in October 2019. Ex. 5 at 1. Mr. Manaf continues to experience "chronic low back" and symptoms of his degenerative disc condition, including "[l]ower lumbar spine L3/L4 and L5/S1 degenerative space narrowing with endplate degenerative osteophyte and lower lumbar spine facet arthropathy." *Id.* at 2. The pain in Mr. Manaf's back hinders his ability to sit, stand, and engage in daily prayers,

---

[3] Since this letter was previously filed under seal, defense counsel has furnished a courtesy copy as Exhibit 5 for the Court's convenience. *See* Dkt. 100 (order granting request for medical evaluation and treatment upon consideration of Defendant's September 20, 2023 letter).

and is so severe that he needs medication to help him sleep at night. *See id.* at 1–2; PSR ¶ 88. Mr. Manaf has also experienced knee problems for several years. PSR ¶ 87.

Mr. Manaf has also suffered from significant dental problems while in custody. PSR ¶ 88. Since at least 2019, Mr. Manaf has been diagnosed with a series of dental health conditions, including "Dental caries," "Pulpitis," "Chronic periodontitis," "Disorder of gingiva and edentulous alveolar ridge," and "Retained dental root," which caused Mr. Manaf extreme pain and difficulty eating certain foods. Ex. 5 at 2. Mr. Manaf continued to experience "[a]ching" and "[t]hrobbing" pain in his "lower right and upper anterior" teeth through February 2023, when he was again diagnosed with "Caries," "Endodontic obturation," "Retained root," and "Gingival inflammation." *Id.* The BOP responded to Mr. Manaf's dental issues by undertaking multiple painful dental extractions that have proven inadequate to resolve his pain or alleviate his symptoms. *Id.* Instead, these extractions have impaired his ability to chew certain foods, and he now finds it painful to eat any food that is not soft. *Id.* at 1; PSR ¶ 88.

Unfortunately, Mr. Manaf struggled to obtain appropriate treatment for his debilitating back and dental pain while in custody. *See* Dkt. 99 (Def's July 13, 2023 Letter to the Court). As previously explained to the Court, Mr. Manaf had been primarily prescribed Ibuprofen for his chronic back pain, a palliative that did nothing to treat his worsening degenerative disc condition. *See* Ex. 5 at 2. Meanwhile, Mr. Manaf's dental health deteriorated as the only treatment offered to him by BOP dental personnel was the extraction of teeth. *Id.* Only upon application to the Court did Mr. Manaf obtain an order requiring the BOP to arrange for an MRI of Mr. Manaf's spine and an examination by an independent dentist. *See* Dkt. 100.

Mr. Manaf takes medication to assist with incontinence because he has an enlarged prostate. PSR ¶ 87; *see also* Ex. 5 at 5, 9 ("Enlarged prostate with lower urinary tract symptoms

6

(BPH)").  He also takes medication due to high cholesterol.  PSR ¶ 87; *see also* Ex. 5 at 4, 9 ("Hyperlipidemia, unspecified").

In addition to these physical conditions, Mr. Manaf also suffers from addiction and mental health conditions.  Prior to his arrest in 2018, Mr. Manaf developed a severe opioid addiction and smoked opium daily for over a decade.  PSR ¶ 93; *see also* Ex. 5 at 4, 9 (listing "Opioid Use Disorder: Severe" as a current health problem).  Although he sought treatment several times during this period at the urging of his wife, Fatimah, Mr. Manaf was able to maintain sobriety only temporarily.  PSR ¶ 94.  Mr. Manaf experienced significant physical withdrawal symptoms while in custody in Estonia, and he has not smoked opium since his arrest.  PSR ¶¶ 93–94.

Mr. Manaf has also been diagnosed with mental health conditions related to anxiety and depression.  PSR ¶ 91; *see also* Ex. 5 at 4, 9 (listing "Adjustment Disorders: With Mixed Anxiety And Depressed Mood" as a current health problem).  These mental health conditions derive from Mr. Manaf's current legal situation, particularly his separation from his family and his inability to provide for his children.  PSR ¶ 91; *see also* Dkt. 99 ("I am not able to take care of my family & kids. My family is suffering with me.").

Mr. Manaf's medical conditions have been exacerbated by his lack of treatment while in federal custody.  Upon his extradition to the United States in February 2019, Mr. Manaf was held at the Metropolitan Correctional Center ("MCC") until September 2021, when he was transferred to the Metropolitan Detention Center ("MDC").  *See* PSR ¶ 9; Ex. 5 at 1.  Since he was held at the MCC during the height of the COVID-19 pandemic, Mr. Manaf was subject to "conditions that posed a substantial risk to the health of all inmates."  *Fernandez-Rodriguez v. Licon-Vitale*, 470 F. Supp. 3d 323, 328 (S.D.N.Y. 2020).  Like so many other inmates, Mr. Manaf was not spared from the "fail[ure] to implement common-sense measures to stop the spread of the virus" at the MCC,

7

*id.*, and he contracted COVID-19 multiple times while in custody, PSR ¶ 87. Not long after the COVID-19 pandemic, federal authorities closed the MCC due to the poor quality of conditions at the facility. *See United States v. Chavez*, 710 F. Supp. 3d 227, 228 & n.1 (S.D.N.Y. 2024).

Mr. Manaf's situation has not improved since his transfer to the MDC, where inmates are subject to "near-perpetual lockdowns (no longer explained by COVID-19), dreadful conditions, and lengthy delays in getting medical care"—issues that courts have acknowledged in decisions regarding confinement at the facility. *Id.* at 228; *see also United States v. Griffin*, No. 22-CR-408 (EK), 2024 WL 2891686, at *3 (E.D.N.Y. June 10, 2024) ("[I]t has been well documented that the MDC has an ongoing issue with frequent lockdowns due to violence and the threat of violence, among other concerns, which has delayed medical care for a number of inmates."); *United States v. Santana*, No. 22 CR. 368 (VM), 2024 WL 2275037, at *2 (S.D.N.Y. May 20, 2024) ("Given the severe prison conditions that prevail at the MDC (conditions that amount to imposing harsher punishments on prisoners), this Court and others have adjusted sentences of defendants in custody there for lengthy periods."). Most relevant here, "the MDC is notoriously and, in some instances, egregiously slow in providing necessary medical and mental health treatment to inmates — especially where such care requires the attention of outside providers." *Chavez*, 710 F. Supp. 3d at 234; *see also United States v. Colucci*, No. 23-CR-417 (GRB), 2024 WL 3643857, at *3 (E.D.N.Y. Aug. 5, 2024) ("That critical medical care is frequently delayed or denied within the facility seems no longer in doubt.").

Given Mr. Manaf's medical conditions, which are exacerbated by his age, it is questionable whether Mr. Manaf will survive the grueling circumstances of incarceration for many more years.

8

IV.    **The Offense Conduct**

A.    The Narcotics-Related Charges

In January 2018, a paid informant ("CS-1") of the Drug Enforcement Administration ("DEA") introduced Mr. Manaf to a DEA undercover agent (the "UC") posing as a drug trafficker from Afghanistan seeking to purchase heroin for sale in the United States. PSR ¶ 13. There was no evidence that Manaf had ever shipped or attempted to ship heroin to the United States before. From February through August 2018, the UC and Mr. Manaf communicated by WhatsApp calls and messages about a deal in which Mr. Manaf would supply the UC a 10-kilogram sample of heroin in Kabul, Afghanistan for delivery into the United States, a possible precursor to distributing larger amounts of heroin in the future. PSR ¶¶ 14–44.

During certain of these communications, Mr. Manaf stated that he paid the Taliban to ensure safe passage of the shipment through Afghanistan for delivery by CS-1 to an associate of the UC—another paid DEA informant ("CS-2")—in Kabul. Mr. Manaf explained that he paid the Taliban to register a stamp under the name "Helmand 1" that was placed on the heroin packages delivered as part of the 10-kilogram sample. PSR ¶¶ 27–39. For example, in a call on July 26, 2018, Mr. Manaf explained that the Taliban charge "10,000 Kaldar or 20,000 Kaldar for the stamp." Trial Tr. 181:24–184:17. At the time, one Kaldar (another name for rupees, the currency of Pakistan) was worth approximately $0.0078 USD. *See* Ex. 6 (DX 1206); Trial Tr. 207:8–13. Accordingly, the stamp was worth, at most, approximately $156 USD.

On or around August 5, 2018, CS-1 delivered the 10-kilogram heroin sample from Helmand to Wardak, where it was picked by CS-2. Trial Tr. 674:21–679:15; 684:10-16. In particular, CS-1's family members picked up in the heroin sample in the town of Musa Qala in Helmand, before meeting CS-1 and dropping him off with the sample at a bus station in Kandahar. CS-1 then travelled with the heroin sample by public transportation to Maidan Shahr in Wardak.

9

Trial Tr. 679:1–680:18.  CS-1 did not observe any members of the Taliban during the heroin delivery.  Trial Tr. 867:4–868:19.  On or around August 6, 2018, CS-2 delivered the 10-kilogram heroin sample from Wardak to DEA agents in Kabul.  Trial Tr. 876:18–877:20.  The packages contained the "Helmand 1" stamp, a picture of which Mr. Manaf had previously shared with the UC.  Trial Tr. 192:3–193:4; 212:18–213:6.  As part of the DEA's operation, the UC facilitated a payment of approximately $18,000 to Mr. Manaf for the 10-kilogram sample.  Trial Tr. 216:15–22.

Mr. Manaf also agreed to a proposal by the UC to transfer money that the UC said would compensate the Haqqani Network in connection with an entirely separate drug transactions that the UC claimed he completed before meeting Mr. Manaf.  PSR ¶¶ 19–24; 30–32; 34; 40. Specifically, on June 20, 2018, the UC said that he had completed a heroin deal five to six months in the past, in which one or more members of the Haqqani Network transported heroin through their territory in Afghanistan.  Trial Tr. 95:24–97:20; 384:4–9.  Of course, that purported deal had never taken place.  Trial Tr. 225:22–226:23.  On August 8, 2018, Mr. Manaf agreed to accept a money transfer of $50,000 AUD from Australia—the purported location where the drugs were shipped months before Mr. Manaf met the UC—to Kabul so that the UC's associates could provide it to the Haqqani Network.  Trial Tr. 223:3–224:19.  As part of the DEA's operation, the UC facilitated the transfer of $50,000 AUD from Australia to Kabul through a money remitter identified by Mr. Manaf.  Trial Tr. 221:20–223:2.  On August 12, 2018, CS-2 picked up the money at a money remitter in Kabul and delivered it to DEA agents.  Trial Tr. 892:22–893:1.

On October 9, 2018, the UC and Mr. Manaf met in Tallinn, Estonia, under the pretense of discussing larger, future drug transactions.  Trial Tr. 242:23–243:4.  Throughout the course of the operation, the UC had boasted that he could supply ever increasing quantities of heroin to the U.S.

10

market at massive profit to the UC and Mr. Manaf. *See* Ex. 7 (GX 202-T) at line 7 ("[W]e can get ready for a big deal"); Ex. 8 (GX 215-T) at line 1 ("God's willing, our business has reached to 500 pieces, ok?"). At the meeting in Estonia, the UC proposed the idea of selling 1,500 kilograms of heroin per year in three 500-kilogram shipments that would make Mr. Manaf tens of millions of dollars. Trial Tr. 315:2–8; *see also* Ex. 9 (GX 601C-T) at line 1 ("[I]f you and I do 1,500 kilograms in 3 tours in 1 year, 500 kilograms in every tour, 1,500 kilograms per year, if you and I can deliver that much, not only New York, we will have the entire markets of east of America under your and my control"). Unsurprisingly, Mr. Manaf responded enthusiastically. Trial Tr. 293:5–14. Mr. Manaf was arrested by Estonian authorities shortly after the meeting on October 9, 2019. On February 6, 2019, Mr. Manaf was extradited to the United States, where he has remained in continuous federal custody. PSR ¶ 45.

B.     The Witness Tampering Charges

On February 28, 2019, some of Mr. Manaf's relatives confronted CS-1 in Helmand and took him to their family home in Kandahar. Trial Tr. 687:6–691:16. Once there, Mr. Manaf's relatives questioned CS-1 about the UC, whom CS-1 had introduced to Mr. Manaf. As this was happening in Afghanistan, Mr. Manaf called from the MCC and spoke with his family members, as well as CS-1. Trial Tr. 695:9–25. Mr. Manaf told a relative, "If he is not confessing don't let him go and take the phone from him." Ex. 10 (GX 903A-T) at line 44. Following the call, Mr. Manaf's relatives seized CS-1's phone, struck him, and threatened him and his family, before allowing CS-1 to leave on the condition that he attempt to locate the UC. Trial Tr. 702:23–703:18.[4]

---

[4] Although CS-1 testified at trial that one of Mr. Manaf's relatives threatened him with a Kalashnikov, notes from multiple contemporaneous meetings between CS-1 and the government do not reflect any mention of a gun during this incident. Trial Tr. 1107:7–1108:8.

**ARGUMENT**

For the reasons set forth below, we respectfully submit that the sentencing factors this Court must consider under 18 U.S.C. § 3553(a) weigh in favor of the mandatory minimum sentence. A twenty-year sentence reflects the serious nature of the offense, while avoiding unwarranted disparities with similarly-situated defendants. Given Mr. Manaf's age and health conditions, 240 months' imprisonment is the only available sentence that would permit Mr. Manaf even the possibility of returning to his family in Afghanistan and Pakistan. Finally, the twenty-year mandatory minimum—already a long sentence, particularly for a person of Mr. Manaf's age and health status—is sufficient to achieve the other goals of sentencing.

## I.    Applicable Law

Courts "shall impose a sentence sufficient, but not greater than necessary" to achieve the specific purposes of sentencing. 18 U.S.C. § 3553(a). These include punishing the defendant, deterring the defendant and others in the community from committing the same crime, incapacitating the defendant by removing him from the public, and rehabilitating the defendant. *Id.* § 3553(a)(2). To determine an appropriate sentence, courts must also consider "the nature and circumstances of the offense and the history and characteristics of the defendant," among other enumerated factors, such as the avoidance of "unwarranted sentence disparities" among similarly-situated defendants. *Id.* § 3553(a)(1), (6).

One of those factors is the sentencing range calculated by the U.S. Sentencing Guidelines (the "Guidelines"). *Id.* § 3553(a)(4). As this Court is well aware, however, it has long been "emphatically clear" that the "Guidelines are guidelines—that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). Sentencing courts have "very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime," and are "generally free to impose sentences outside the recommended [Guideline] range."

12

*Id.* at 188–89.  Moreover, sentencing courts may not "presume that the Guidelines range is reasonable" and, instead, "must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007).  Accordingly, the Guidelines serve as only "one factor to be considered in imposing a sentence." *United States v. Booker*, 543 U.S. 220, 234 (2005).

Under all applicable factors and the specific facts of this case, the mandatory minimum of 240 months' imprisonment is the only sentence "sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  18 U.S.C. § 3553(a).

## II.    Guidelines Calculation

The U.S. Probation Office ("Probation Office") calculates a total offense level of 43, a criminal history category of VI,[5] and a resulting Guidelines sentence of life imprisonment.  PSR ¶¶ 71, 74, 101.  The Probation Office nonetheless recommends a sentence of 420 months' (35 years') imprisonment based on Mr. Manaf's "physical health conditions and immense number of dependent children who can no longer attend school."  PSR, Sentencing Recommendation at ¶¶ 36–37.  The Probation Office's recognition that Manaf's "familial responsibilities" and "physical health concerns" warrant a sentence below the Guidelines range is compelling.  PSR ¶ 120.  But the specific sentence recommended is in practice not a departure at all; indeed, the Probation Office acknowledges it is "essentially . . . a life sentence."  PSR, Sentencing Recommendation at 38.  To truly address the mitigating circumstances recognized by the Probation Office and discussed herein, a sentence at the mandatory minimum of 20 years is appropriate.

---

[5] Although Mr. Manaf is a first-time offender with a criminal history score of zero, his criminal history category was upgraded from I to VI under U.S.S.G. §3A1.4(b) because the offense conduct involved a federal crime of terrorism.  PSR ¶ 74.

**III.    The Remaining Sentencing Considerations Support a Sentence of No More than 240 Months' Imprisonment.**

    A.    <u>The Nature and Circumstances of the Offense, as well as the Need to Avoid Unwarranted Sentencing Disparities, Warrant Leniency.</u>

Mr. Manaf's offenses were undeniably serious. The jury, through its verdict, concluded that Mr. Manaf attempted to import one or more kilograms of heroin into the United States; distributed one or more kilograms of heroin while providing something of value to the Taliban; attempted to distribute one or more kilograms of heroin while attempting to provide something of value to the Haqqani Network; and both conspired to, and directed others to, engage in witness tampering after charges were first brought against him. Even for a first-time offender like Mr. Manaf, a conviction for this offense warrants meaningful punishment. Nonetheless, "the nature and circumstances of the offense" weigh in favor of the 20-year mandatory minimum based on the specific facts here. 18 U.S.C. § 3553(a)(1).

    *1.    Attempted Narcotics Importation*

The attempted narcotics importation scheme involved Mr. Manaf's delivery of ten-kilograms of heroin through Afghanistan to the UC—a transaction that took place over a six-month period. *See* PSR ¶¶ 13–45. There is no evidence in the record that Mr. Manaf had delivered drugs for sale in the United States prior to meeting the UC, or that he even had the capacity to do so. Indeed, Mr. Manaf repeatedly stated that he did not have a "way" to the United States in his first meeting with the UC. *See* Ex. 11 (GX 201B-T). Lacking the ability to import the heroin into the United States himself, Mr. Manaf agreed to deliver the sample in Kabul—where he "[didn't] know" the price of heroin—so that the UC could "take [it] all the way to America." Ex. 7 (GX 202-T). Moreover, Mr. Manaf's statements about prior drug transactions—some of which purportedly occurred multiple years in the past—all involve countries other than the United States. *See, e.g.*, Ex. 12 (GX 203A-T) at line 2 (Tanzania); Ex. 13 (GX 203C-T) at line 2 ("from Gwadar,

to Tanzania; it has been two years that I haven't been there"); Ex. 14 (GX 204A-T) at line 1 (Mozambique).

In contrast to other drug importation cases, there is no evidence that Mr. Manaf had been engaging in longstanding violations of U.S. drug laws or that he even had the capacity to do so. *See, e.g.*, *United States v. Yaroshenko*, No. 09-CR-524 (JSR), 2021 WL 4267812, at *1 (S.D.N.Y. Sept. 18, 2021) (20-year sentence for conviction on conspiracy to import five kilograms of cocaine into the United States where "[the defendant's] role in the conspiracy was to use his aviation expertise to help transport these massive amounts of cocaine on private aircraft"); *United States v. Lopez-Pena*, No. 10 CIV. 7381 (DC), 2011 WL 1676286, at *1 (S.D.N.Y. May 2, 2011) (45-year sentence for conviction on conspiracy to import five kilograms or more of cocaine into the United States where the defendant "was a top lieutenant in the Norte Valle cartel, a massive illegal narcotics organization operating out of Colombia in the 1990s and continuing at least until 2005"); *United States v. Suarez*, No. 11 CR. 836 (KBF), 2014 WL 1998234, at *2-3 (S.D.N.Y. May 15, 2014) (54-year sentence where defendant led a "sophisticated, vertically integrated" cocaine-importation enterprise that "included a number of individuals responsible for manufacturing cocaine in laboratories . . . , transporting cocaine to air strips, loading airplanes with cocaine, receiving money from airplanes on return trips or receiving money from trucks, and financiers," and "generated millions of dollars in revenue"), *aff'd*, 615 F. App'x 5 (2d Cir. 2015).

Indeed, some courts have imposed sentences below twenty years in importation cases involving similar quantities of drugs. *See United States v. Khan*, 853 Fed. App'x 743, 744-46 (2d Cir. 2021) (below-Guideline 15-year sentence where an elderly Afghan defendant was convicted of narcotics importation and conspiracy after he agreed to sell a five-kilogram heroin sample to undercover DEA operatives and later promised to engage in larger drug transactions); *United*

15

*States v. Gigliotti*, 287 F. Supp. 3d 353, 354 (E.D.N.Y. 2023) (granting a sentencing-reduction motion and reiterating remarks at sentencing that "the statutorily required 20-year term was excessive" for a scheme to import 120 kilograms of cocaine from Costa Rica into the United States through the restaurant operated by the defendant's family).

2.      *Drug Trafficking with Intent to Provide Financial Support to Terrorism*

The offense conduct related to the counts for drug trafficking and attempted drug tracking with intent to provide financial support to terrorist organizations is also unique.  As an initial matter, there is no evidence in the record that Mr. Manaf was himself a terrorist or engaged in terrorist activity.  Moreover, the evidence regarding Mr. Manaf's relationship to the Taliban and Haqqani Network is often unclear or inconsistent.  Though Mr. Manaf stated that he had ties to members of the Taliban and Haqqani Network in certain conversations with the UC, he also had ties to the Afghan government and even told the UC that he would "load [the drugs] and deliver them to [him] in a governmental vehicle."  Ex. 7 (GX 202-T) at line 8; *see also* Trial Tr. 834:6–12 (CS-1 testimony that an Afghan general lived next to Mr. Manaf); 845:3–7 (testimony that CS-1 observed members of the Afghan government at Mr. Manaf's home).  In one conversation with the UC, Mr. Manaf stated that he supported the Taliban out of fear for the safety of himself and his family.  *See* Ex. 15 (DX 601E-T) ("I helped the Taliban a lot. I was giving them alms. I was honestly scared. I also don't like them. I was giving out of compulsion, ok, because they could have killed my father; they could have killed me, ok?").

In other conversations, Mr. Manaf rejected suggestions from the UC that they provide monetary support to the Taliban beyond the absolute minimum required to deliver the heroin the UC had requested.  For example, when the UC stated, "[w]hatever amount [the Taliban] are going to charge, even in case they want to receive alms, it is not a problem," Mr. Manaf responded that "[the Taliban] have been feeding off the lands. What alms do they want from us?" Ex. 16 (GX

16

206B-T) at lines 7–8.  When the UC stated, "[w]e will pay [the Taliban] more in the future so that they treat us well," Mr. Manaf rejected the UC's suggestion that they pay more money for larger quantities, stating that "[i]t is about registration. It is 20,000 even if you prepare 10,000 pieces." Ex. 17 (GX 206C-T) at lines 27–28.  In another conversation in which the UC offered to transfer "[w]hatever amount of money is needed for the equipment, for the fort, for the commission for the Taliban," Mr. Manaf stated, "No. There is nothing" beyond the "2,000 to 3,000 Kaldar per piece" commission.  Ex. 18 (GX 208D-T) at lines 1–2.  In a later conversation, Mr. Manaf again rejected a suggestion from the UC that they pay a Taliban official "[n]ot 150,000; we will send him 200,000 [Kaldar]," stating, "No. Haji Baba is there and is working on the lands. I always give them. It is not possible that … over there… there is no other alternative."  Ex. 19 (GX 209C-T) at lines 15–16.  Mr. Manaf went on to say that "[the Taliban] have our property and lands in their hands" and "get from us there regardless of whether there is item or not. They get from Haji Baba; they get from the lands. They have nothing to do with you and us."  Ex. 19 (GX 209C-T) at lines 18–20.

The evidence connecting Mr. Manaf to the Taliban with respect to 10-kilogram heroin transaction consisted of Mr. Manaf's statements to the UC that he paid a Taliban official to register a stamp to mark the bags of heroin.  According to evidence in the record, of the $18,000 that Mr. Manaf received from the UC for delivering the heroin sample to Kabul, Mr. Manaf paid the Taliban no more than $156 to register the stamp for the entire 10-kilogram shipment.[6]

---

[6] Notwithstanding the inconsistencies about precise figures in the record, Mr. Manaf informed the UC in a July 26, 2018 call that "[the Taliban] have a commission, a commission of 1,000 to 2,000 Kaldar" per kilogram and that "registration will need 10,000 to 20,000 Kaldar" for the stamp.  Ex. 17 (GX 206C-T) at lines 28–30.  Given the exchange rate as of that day was about 1 Kaldar (Pakistani Rupee) to $0.0078 USD, *see* Ex. 6 (DX 1206), the cost of registering the stamp for the 10-kilogram sample ranged from $78 to $156.

17

Although these facts do not excuse Mr. Manaf's role in a drug transaction that involved a payment to a terrorist organization, they do provide context to his relationship with the Taliban. Mr. Manaf made a payment to the Taliban with knowledge that they were a terrorist organization, conduct for which he should be punished. But there is no evidence in the record that he was a supporter of the Taliban in the sense that he wanted to assist them achieve the aims of their terrorist activities. Instead, Mr. Manaf's limited financial support to the Taliban was incidental to his attempted importation of the 10-kilogram sample into the United States.

The nature of Mr. Manaf's relationship to the Taliban is consistent with the political situation in Afghanistan at the time of the conduct, where the Taliban was the de facto government in large areas of the country, including parts of Helmand and Kandahar. *See* Trial Tr. 454:21–25 ("2018 was a period where the [Taliban] insurgency had really expanded. . . . It was controlling, contesting, or influencing over half the country."); 584:17–585:6 ("The southern part of the province [Kandahar], the Taliban had a lot of influence. . . . But Helmand overall had higher degrees of Taliban control and influence throughout the province."). As described by the government's expert witness, "the Taliban, by the period of 2018, had a fairly systematized for Afghanistan process of extracting taxation from the activity, the economic activities in the community of any given province." Trial Tr. 454:9–12; *see also* Trial Tr. 865:4–9 (CS-1 describing payments made to the Taliban to assist with prior drug trafficking activities as "like [a] tax"). Mr. Manaf, like any other person in the region, interacted with both the official Afghan government and the Taliban. *See* Trial Tr. 589:13–18 ("[I]f you're a person who has business in Kandahar City but is going to need to move around quite a bit outside the city, you would have to deal with both. If you were just in Kandahar City, you probably primarily had to deal with the government, but you also had to be aware of ways in which you had to deal with the Taliban.").

18

Mr. Manaf's conduct with respect to the Haqqani Network is even more tangential, as we argued in support of Mr. Manaf's Rule 29 application at trial. The underlying drug deal that served as the basis for the money transfer that Mr. Manaf executed on behalf of the UC for the benefit of certain members of the Haqqani Network was a fake transaction made up by the UC that had nothing to do with Mr. Manaf. *See* Trial Tr. 406:22–407:7. According to the UC's own statements, the fake drug deal was completed prior to Mr. Manaf's first meeting with the UC in February 2018. *See* Ex. 20 (DX 203D-T) (June 20, 2018 call requesting assistance transferring money in relation to a "deal" the UC did "around 5 to 6 months ago"); Ex. 21 (GX 210D-T) at line 3 (the UC requesting assistance transferring money in relation to a "previous deal"). Furthermore, there is no evidence in the record that the narcotics transaction between Mr. Manaf and the UC would benefit the Haqqani Network. Mr. Manaf stated that he paid the Taliban to register the stamp for the shipment of the 10-kilogram sample, while he and the UC contemplated paying the Taliban to deliver future heroin shipments through a different route in Taliban-controlled territory. *See* Ex. 22 (GX 207C-T) (discussing future shipments delivered by the Taliban through Baram Chah). As with the payment to the Taliban, Mr. Manaf's attempted payment to the Haqqani Network was incidental to his ongoing drug transactions with the UC.

        3.    *Witness Tampering*

The specific facts of the witness tampering conduct are also atypical. The confrontation with CS-1 in February 2019 was done by Mr. Manaf's family members in Afghanistan, while Mr. Manaf was in custody at the MCC. At the time, Mr. Manaf's family members knew little about Mr. Manaf's sudden arrest in Estonia and subsequent extradition to the United States except that Mr. Manaf had travelled to Estonia to meet with the UC, who CS-1 introduced to Mr. Manaf. *See* Trial Tr. 686:2–9. Mr. Manaf's family members, all of whom live in Afghanistan or Pakistan, had no understanding of the U.S. legal system other than what they learned from speaking to Mr.

Manaf.  Of course, Mr. Manaf's role in the witness tampering conduct is serious.  But the panicked response Mr. Manaf and his family had nearly six years ago when Mr. Manaf was arrested in Estonia and brought to a jail in a country he knew nothing about does not support a sentence in excess of 20 years' imprisonment.

4.    *Avoidance of an Unwarranted Disparity Between Similarly-Situated Defendants*

Courts have imposed a mandatory minimum of similar length against defendants convicted of similar crimes involving far more egregious wrongdoing than is present here.  For example, in *United States v. Saade*, the defendant was sentenced to a term of imprisonment of twenty-five years following his conviction on one count of conspiracy to provide material support to terrorists and one count of conspiracy to acquire and transfer anti-aircraft missiles.  No. S1 11 Cr. 111 (NRB), 2013 WL 6847034, at *1 (S.D.N.Y. Dec. 30, 2013).  In particular, the defendant was "found guilty of conspiring to acquire and sell over $25 million worth of weapons, including anti-aircraft missiles, to the Taliban."  *Id.* at *2.  The defendant's plan to arm the Taliban with military-grade weaponry constituted an "indisputably a serious offense" which, "if successful, would have empowered a terrorist organization and threatened the lives of United States soldiers abroad."  *Id.* The 300-month sentence in that case represented the mandatory minimum for conspiracy to acquire and transfer anti-aircraft missiles, *see id.* (citing 18 U.S.C. § 2332g(c)(1)), a more serious offense with a more direct nexus to terrorist activity than the conduct at issue here.

Although Mr. Manaf was aware that the Taliban and Haqqani Network were engaged in terrorist activity, as the Probation Office acknowledged, "[Mr. Manaf] was not directly involved in the horrible acts committed by these terrorist organizations."  PSR, Sentencing Recommendation at 37.  While Mr. Manaf indicated that these organizations could deliver and protect drug shipments using firearms, he did not seek to provide any "weapons for the Taliban to

use in fighting American military forces in Afghanistan," let alone military-grade weapons, such as anti-aircraft missiles. *United States v. Saade*, No. S1 11 CR 111 (NRB), 2012 WL 2878087, at *1 (S.D.N.Y. July 11, 2012). Similarly, the narcotics activity here is not as directly connected to the terrorist organizations as it was in *Saade*. That case involved "multi-ton shipments of *Taliban-owned* heroin" and importation of "heroin and cocaine to the United States, where it would be sold *for the financial benefit of the Taliban*." *Id.* (emphases added). Here, however, Mr. Manaf's relationship to terrorist organizations was incidental to his drug activity. Other than the $156 payment to the Taliban to register the stamp for the 10-kilogram sample and the money transfer to the Haqqani Network as part of a fake drug transaction he was not involved in, Mr. Manaf did not take any action to support the terrorist organizations or their terrorist activity. In fact, he rejected several offers by the UC to pay the Taliban additional money.

Indeed, this Court has previously sentenced an aging defendant with health problems convicted under 21 U.S.C. § 960a, among other more serious offenses, below the Guidelines range to the applicable mandatory minimum. In *United States v. Garavito-Garcia*, this Court imposed a sentence of 300 months' (25 years') imprisonment, departing from the Guidelines calculation of life. Judgment at 3, *United States v. Garavito-Garcia*, 12 Cr. 839 (JSR) (S.D.N.Y. July 22, 2015), Dkt. 109. The defendant in that case was convicted after trial of four counts: (1) conspiracy to commit narco-terrorism in violation of 21 U.S.C. § 960a; (2) conspiracy to import cocaine into the United States in violation of 21 U.S.C. § 963; (3) conspiracy to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 23398(a)(1); and (4) conspiracy to acquire and transfer anti-aircraft missiles in violation of 18 U.S.C. § 2332g(a). *Id.* at 1-2. There, the defendant "was a leader of a conspiracy to traffic cocaine to and through Guinea Bissau on behalf of individuals whom the defendant understood to be representatives of the Fuerzas Armadas

21

Revolucionarias de Colombia" (the "FARC"). Gov't Sentencing Mem. at 1, *United States v. Garavito-Garcia*, 12 Cr. 839 (JSR) (S.D.N.Y. July 16, 2015), Dkt. 108. Beyond the scheme to transport "thousands of kilograms of FARC cocaine through Guinea Bissau, with a portion of that cocaine to be routed to the United States," the defendant also conspired to "help the FARC obtain an array of military weaponry, including powerful surface-to-air missiles." *Id.* at 2. In particular, the defendant was involved in brokering a deal "to help the FARC acquire advanced weaponry *to combat U.S. military personnel* in Colombia." *Id.* (emphasis added). As the Court explained at sentencing, the defendant in *Garavito-Garcia* "was a person who was sought to be approached because of his ability not only to deal in large quantities of narcotics and other illegal things, but also because he knew how to corrupt entire governments." Sentencing Tr. 14:1-4, *United States v. Garavito-Garcia*, No. 15-2454, Dkt. 21.

The conduct at issue here does not involve the direct connection to dangerous terrorist activity that existed in *Garavito-Garcia*. Mr. Manaf did not import significant quantities of narcotics owned by the Taliban or Haqqani Network. Nor did he seek to arm them with sophisticated, military-grade weapons for use against U.S. personnel. Notwithstanding these important distinctions, this case does contain similar mitigating facts that the Court identified in *Garavito-Garcia*. For one, it "involved a defendant who [has] very serious health problems." *Id.* at 19:23-24. Additionally, this case centered on "a concocted scheme . . . that involved a defendant who did not appear to have previously had much interest in criminal activity affecting the United States." *Id.* at 19:20-23. Like that case, "this was an inchoate offense, it was a sting operation, it was an operation that would never in fact result in any actual substantive delivery of drugs or weapons or the like." *Id.* at 14:24-15:2. Just as it did in *Garavito-Garcia*, which involved far

22

graver conduct than that at issue here, this Court should sentence Mr. Manaf to the mandatory minimum.

The specific facts of this case mean that a sentence at the mandatory minimum would not "avoid *unwarranted* sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6) (emphasis added). In *United States v. Mohammed*, for example, the defendant was sentenced to life after being convicted of international drug trafficking in violation of 21 U.S.C. § 959(a) and drug trafficking with intent to provide financial support to a terrorist in violation of 21 U.S.C. § 960a. 693 F.3d 192, 195–97 (D.C. Cir. 2012). There, the offense conduct included the defendant's participation in a scheme by "a former Taliban official" who "was plotting an attack on the Jalalabad airfield, a strategic NATO airbase in eastern Afghanistan." *Id.* at 195.[7] Similarly, in *United States v. Bagcho*, the defendant was sentenced to life after being convicted of conspiracy to distribute heroin into the United States in violation of 21 U.S.C. § 963, distribution of heroin into the United States in violation of 21 U.S.C. § 959(a), and narcotics trafficking while funding terrorism in violation of 21 U.S.C. § 960a. 151 F. Supp. 3d 60, 63–65 (D.D.C. 2015), *aff'd*, 923 F.3d 1131 (D.C. Cir. 2019). There, the defendant "ran a large heroin trafficking operation in Afghanistan, beginning during the time of Taliban rule and continuing after the American invasion in 2001," and "was funneling money, weapons, and supplies to members of the Taliban to support jihad." *Id.* at 64–65.[8] Both cases involved conduct with a significantly more direct connection to deadly terrorist activity than Mr. Manaf's conduct

---

[7] The defendant's narco-terrorism conviction was later vacated on grounds of ineffective assistance of counsel due to failure to investigate the witness whose testimony was the only evidence supporting the narcoterrorism charge. *See United States v. Mohammed*, No. CR 06-357 (CKK), 2021 WL 5865455, at *3, *12 (D.D.C. Dec. 9, 2021).

[8] The defendant's narco-terrorism conviction was vacated as a result of a *Brady* violation related to impeachment evidence for the witness whose testimony was the only evidence supporting an element of the narcoterrorism charge. *Bagcho*, 151 F. Supp. 3d at 63..

23

in this case.  Accordingly, a 240-month sentence would not result in an unwarranted disparity between otherwise similarly-situated defendants.

Mr. Manaf's conduct more closely resembles that of the defendant in *United States v. Henareh*, where this Court imposed a sentence of 210 months' imprisonment, departing from a Guidelines range of 292 to 365 months.  No. 11 Cr. 93-1 (JSR), 2021 WL 119016, at *1 (S.D.N.Y. Jan. 13, 2021).  In that case, the defendant was convicted of conspiracy to import heroin in violation of 21 U.S.C. § 963 after he "brokered a 190-kilogram heroin transaction" in which "some of the proceeds were meant to finance the terrorist organization Hezbollah."  *Id.*  This Court found that:

> a Guidelines sentence would be greater than necessary to comply with the purposes of criminal sentencing because (1) Henareh's role and involvement were "far from critical to the conspiracy," (2) he had no prior criminal record, (3) "all the evidence before the Court suggests that in every other aspect of his life, he has conducted himself as a good father, good family man, good citizen, good person," and (4) the Guidelines range called for a sentence "reserved for either kingpins or major recidivists or others whose life conduct bespeaks a degree of venality and evil that cannot truly on these facts be imputed to Mr. Henareh.

*Id.* (quoting Sentencing Tr.). That case involved conduct with a more direct nexus to deadly terrorist activity than here, including the defendant's "involvement in a huge narcotics scheme whose *purpose*, moreover, was to provide support for terrorist activities."  *Id.* (emphasis added) (quoting Sentencing Tr.).  Unlike the incidental connections to the Taliban in this case, the defendant in *Henareh* conspired to sell drugs to confidential sources posing as representatives of Hezbollah, meaning that "the only purpose of [the drug scheme] was to fund a terrorist group." Sentencing Tr. 22:14–15, *United States v. Henareh*, 11 Cr. 93 (JSR) (S.D.N.Y. Apr. 18, 2013), Dkt. 92; *see also id.* 19:12–16 ("The defendant was sitting in meeting after meeting where he was told that the confidential sources were representatives of Hezbollah. That they were taking the moneys sold -- they were taking the proceeds of the drug transactions and funneling them back to a terrorist

group to buy weapons."). Notwithstanding this key distinction, Mr. Manaf is similarly-situated to the defendant in *Henareh* in that he is a first-time offender, a devoted father and family man who has contributed to his community, and neither a kingpin nor recidivist whose conduct warrants the Guidelines calculation of life. Accordingly, a sentence of 240 months' imprisonment here would not represent an unwarranted departure from the 210-month sentence in imposed in case.

In sum, Mr. Manaf's age and health concerns, his familial responsibilities, and the nature and circumstances of the offense make a variance from the sentences of similarly situated defendants to the twenty-year mandatory minimum entirely warranted.

B.      Mr. Manaf's History and Characteristics Warrant Leniency.

The "history and characteristics of the defendant" weigh in favor of a 20-year mandatory minimum sentence here. 18 U.S.C. § 3553(a)(1). In particular, Mr. Manaf's background growing up in Afghanistan and Pakistan, his familial responsibilities as the head of a large family, and his age and medical conditions all support a sentence of 240 months' imprisonment.

Mr. Manaf had never stepped foot in the United States prior to his extradition in February 2019. Mr. Manaf was born in Helmand, Afghanistan in 1965, the oldest of 17 children. PSR ¶ 79. Although Mr. Manaf had a good childhood, the Soviet invasion of Afghanistan in 1979 upended the lives of him and his family. PSR ¶ 81. Mr. Manaf's father was held as a political prisoner for several months, and his family's land and their livelihood were destroyed by the invading Soviet army. To avoid the conflict, Mr. Manaf's family settled in Pakistan, where he lived until his arrest in 2018. PSR ¶ 80. The war prevented Mr. Manaf from attending school as a teenager. Since he did not receive an education, Mr. Manaf never learned to read and remains illiterate to this day. He speaks Pashto and Farsi, two languages common in Afghanistan and Pakistan. PSR ¶ 95.

With his 80-year-old father suffering from senility and mobility issues, Mr. Manaf is effectively the head of his large family. PSR ¶ 79. In addition to his siblings, Mr. Manaf is the

father of 20 children, all of whom live in Pakistan. PSR ¶¶ 83–84. Unfortunately, Mr. Manaf has not been able to see or support his family since his arrest by Estonian authorities in October 2018. Since then, Mr. Manaf's family has supported themselves through income derived from crops grown on family land shared by Mr. Manaf's siblings. PSR ¶ 82. However, Mr. Manaf's absence has nonetheless put strain on his family. *See* Ex. 1 (Letter of Ahmed Kahn) ("Since his absence, our family has felt an immense void. Without Mr. Manaf, we lack his guidance and support, and our lives have been deeply affected. He is more than just a relative; he is our family's foundation. His absence has been an emotional and practical hardship for all of us."). His children have been unable to afford tuition to attend school in Pakistan despite his family's attempts to earn money by selling off property. PSR ¶ 82. Mr. Manaf's fourteen-year-old daughter Laibah, in particular, has become depressed since she can no longer attend school. Mr. Manaf's first wife, Radigul, has also begun suffering from poor health recently. Fortunately, Mr. Manaf's second wife, Fatimah, and his remaining children enjoy good health. PSR ¶¶ 83–84.

In addition to being loving, supportive, and generous to his extended family, Mr. Manaf also has been an important and influential part of his community. He has contributed to numerous charitable causes, including schools, hospitals, and direct assistance to families in need. He has also served as a mediator who has helped people in his community resolve conflicts in just and peaceful ways. Through these works, Mr. Manaf became a well-respected figure within his community. *See* Ex. 3 (Letter from Saifullah) ("Many community members view him as a role model for compassion, kindness, and service, and they are deeply grateful for the support he has offered.").

A sentence of more than 240 months' imprisonment will be particularly difficult for Mr. Manaf given his age and health issues. Mr. Manaf is a 59-year-old first-time offender.

Unfortunately, research suggest that people over 50 have a much harder time adjusting to prison life, and the United States has a rapidly surging aging prison population with challenges that prison facilities have neither the financial nor medical resources to tackle. *See* ACLU, *AT AMERICA'S EXPENSE: The Mass Incarceration of the Elderly* 28–29 (June 2012), https://www.aclu.org/files/assets/elderlyprisonreport_20120613_1.pdf ("[T]he prison environment is, by design, an extremely poor place to house and care for people as they age or become increasingly ill or disabled. . . . Very often, correctional and healthcare staff lack appropriate training and technical expertise and have not been properly trained to treat age-related illnesses[.]"). In particular, "separation from family and friends, physical confinement, poor healthcare, and the threat of victimization," among other difficulties of incarceration, "exacerbate the risk of physical and mental illness and accelerate the aging process." *Id.* at 1. Indeed, the Department of Justice has identified that issues concerning the oversight of older inmates, specifically those aged 50 and above, become more complex within the confines of prison. *See* B. Jaye Anno, Ph.D, et al., *Correctional Health Care, Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, U.S. Dep't of Just. Nat'l Inst. of Corr. 9–10 (Feb. 2004), https://static.prisonpolicy.org/scans/nic/018735.pdf.

More recently, a 2016 report by the Office of Inspector General of the U.S. Department of Justice explained that the Bureau of Prisons ("BOP") has "limited institution staff and inadequate staff training," which affects "BOP's ability to address the needs of aging inmates. The physical infrastructure of BOP institutions also limits the availability of appropriate housing for aging inmates." OFFICE OF THE INSPECTOR GENERAL, U.S. DEP'T OF JUSTICE, THE IMPACT OF AN AGING INMATE POPULATION ON THE FEDERAL BUREAU OF PRISONS 1 (2016) (hereinafter "OIG Report"), https://oig.justice.gov/reports/2015/e1505.pdf. Furthermore, first-time offenders sentenced to

27

prison at Mr. Manaf's age "are likely to have problems adjusting to prison since they are new to the environment, which will cause underlying stress and probable stress related health problems, . . . are 'easy prey' for more experienced predatory inmates, . . . [and] are frequently severely maladjusted and especially at risk" for a variety of negative outcomes.  B. Jaye Anno, *Correctional Health Care*, 10–11.

The challenges of incarceration that Mr. Manaf faces due to his age are likely to be exacerbated by his serious health issues.  Mr. Manaf suffers from the following medical conditions that require ongoing monitoring, treatment, and, in some cases, medication: chronic back pain originating from an injury suffered during his arrest in Estonia; knee pain; severe dental issues requiring multiple tooth extractions; an enlarged prostate; high cholesterol; and mental health conditions related to anxiety and depression.  PSR ¶ 88.  Mr. Manaf also suffered from opioid addiction at the time of the instant offense, having smoked opium daily for over a decade.  PSR ¶ 93.  The challenges of providing medical care to aging inmates have been acknowledged by DOJ, which found that "BOP institutions lack appropriate staffing levels to address the needs of an aging inmate population and provide limited training for this purpose. . . . As a result, aging inmates experience[d] delays receiving medical care."  OIG Report at ii; *see also id.* at 17 ("Aging inmates have an increased need for health services; but, according to BOP officials, staff, and inmates, institutions lack adequate health services staff to address these needs.").

The severity of Mr. Manaf's health issues has also been exacerbated by the dreadful conditions he has experienced while in federal custody.  For more than two years, he was incarcerated at the MCC, where the facility's "response to the pandemic was ad-hoc and overlooked many gaps in its scheme to identify and isolate infected inmates — creating conditions that posed a substantial risk to the health of all inmates."  *Fernandez-Rodriguez*, 470 F. Supp. 3d

at 328. Since the closure of that facility in September 2021, Mr. Manaf has been held at the MDC, which has well-documented issues providing medical care to inmates. *See Chavez*, 710 F. Supp. 3d at 228 n.3 (collecting "representative examples" of complaints of lockdowns, dreadful conditions and delayed medical care); *Colucci*, 2024 WL 3643857, at *4–6 (listing incidents demonstrating "a woeful lack of supervision over the facility, a breakdown of order and an environment of lawlessness within its confines that constitute unacceptable, reprehensible and deadly mismanagement"). For several years while in custody, Mr. Manaf received inadequate care for his severe back and dental pain, and only obtained requested attention, evaluation, and treatment through intervention of the Court. *See* Ex. 5; Dkt. 100.

Unfortunately, Mr. Manaf's age and health concerns have profound ramifications for his and his family's future. Mr. Manaf has been incarcerated continuously since his arrest by Estonian authorities in October 2018 at the age of 53. PSR ¶ 52. If the Court imposes the 35-year sentence recommended by the Probation Office, Mr. Manaf will not be released until he is almost ninety years old. Given Mr. Manaf's medical conditions and the reduced quality of life for inmates in prison, it is highly unlikely that Mr. Manaf would live for almost three decades, the remaining duration of that sentence. As the Probation Office itself recognized, Mr. Manaf would "still essentially receiv[e] a life sentence" under this downward variance from the Guidelines range of life. PSR, Sentencing Recommendation at 38. Even the 20-year mandatory minimum is likely to constitute a life sentence given Mr. Manaf's age and health concerns. However, it is the only available sentence that would give Mr. Manaf the possibility of one day returning home and living with his family upon release. Accordingly, Mr. Manaf's history and personal characteristics warrant a sentence at the 240-month mandatory minimum.

29

C.     A Sentence at the Mandatory Minimum Will Achieve the Goals of Sentencing.

The mandatory minimum sentence of 240 months' imprisonment is also "sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which include the need (1) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; (2) "to afford adequate deterrence to criminal conduct" and "to protect the public from further crimes of the defendant"; and (3) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2).

*First*, a sentence of 240 months' imprisonment is sufficiently punitive, as it reflects the seriousness of the offense, promotes the rule of law, and provides just punishment.  The statute that carries the 20-year mandatory minimum contains two elements:  (1) engaging in a drug offense that would be punishable under 21 U.S.C. § 841(a) if committed within the jurisdiction of the United States; and (2) knowing or intending to provide something of pecuniary value to a person or organization that has engaged or engages in terrorist activity or terrorism.  21 U.S.C. § 960a. Notably, federal law separately proscribes drug importation, *see* 21 U.S.C. § 959, and prohibits providing material or financial support to terrorist and terrorist organizations, *see* 18 U.S.C. §§ 2332d, 2339A, 2339B, 2339C.  However, even if charged together, these separate offenses do not mandate twenty years' imprisonment, which reflects the seriousness of the mandatory minimum sentence devised by Congress for violating the narco-terrorism statute.  *See* 21 U.S.C. § 960(b) (ten-year mandatory minimum for a violation of 21 U.S.C. § 959 involving 1 kilogram or more of a mixture or substance containing a detectable amount of heroin); 18 U.S.C. §§ 2332d (ten-year mandatory maximum), 2339A (fifteen-year maximum, unless the death of any person results from the violation), 2339B (twenty-year maximum, unless the death of any person results from the violation), 2339C (twenty-year and ten-year maximums).

30

*Second*, the twenty-year mandatory minimum will promote both deterrence and incapacitation. A sentence of this length sends the message that engaging in a drug offense while knowing or intending to provide something of pecuniary value to a person or organization that has engaged or engages in terrorist activity—even when not involved in specific terrorist acts committed by such persons or organizations—will be met with heavy punishment. Mr. Manaf, who will have remained incarcerated for two decades of his life on account of his conduct, will also be deterred after the harsh punishment he receives for his first criminal conviction.

*Third*, the goal of rehabilitation is more than met by a twenty-year sentence since Mr. Manaf's age and medical condition renders recidivism unlikely. Even where "the defendant has already received significant sentences that failed to get the message across"—which is not the case here—courts have considered a defendant's older age when imposing sentences, because "the statistics are quite substantial that age is inversely related to recidivism." Sentencing Tr. 11, *United States v. Waller*, No. 20 Cr. 006 (JSR) (S.D.N.Y. Aug. 19, 2021), Dkt. 44; *see also United States v. Willis*, 322 F. Supp. 2d 76, 84-85 (D. Mass. 2004) (imposing a below-Guideline sentence of probation, with special condition of home confinement, on 69-year-old defendant suffering from several medical conditions and stating that the defendant was "not likely to be a recidivist"); *United States v. Greene*, 249 F. Supp. 2d 262, 267 (S.D.N.Y. 2003) (imposing a below-Guideline sentence of probation where the court found it was "highly unlikely" the defendant would recidivate, due in part to the fact that he was 65 years old and had no prior criminal history). These acknowledgments by courts that older defendants are substantially less likely than younger defendants to recidivate are consistent with a recent study by the U.S. Sentencing Commission, which found low recidivism rates for offenders released after the age of 50. UNITED STATES SENTENCING COMM'N, OLDER OFFENDERS IN THE FEDERAL SYSTEM 55 (2022),

https://www.ussc.gov./sites/default/files/pdf/research-and-publications/2022/20220726_Older-Offenders.pdf.  Relevant here, the study found that the recidivism rate of defendants between the ages of 55 and 59 at the time of sentencing was 20 percent, while that of defendants between the ages of 70 and older at the time of release was only 10 percent.  *Id.*

At 59 years old, Mr. Manaf is far "over the age of forty at the time of sentencing" and thus within the range of adults who "exhibit markedly lower rates of recidivism in comparison to" those sentenced at a younger age.  *United States v. Ruiz*, No. 04 Cr. 1146-03 (RWS), 2006 WL 1311982, at *4 (S.D.N.Y. May 10, 2006); *see also United States v. Hernandez*, No. 03 Cr. 1257 (RWS), 2005 WL 1242344, at *5–6 (S.D.N.Y. May 24, 2005) (imposing non-Guidelines sentence on 49-year-old defendant in part because defendants over 40 are less likely than younger defendants to reoffend).  The fact that Mr. Manaf will be over seventy years old and statistically unlikely to reoffend regardless of what sentence is imposed weighs in favor of sentencing Mr. Manaf below the Guidelines to the 20-year mandatory minimum.  *See United States v. E.L.*, 188 F. Supp. 3d 152, 174 (E.D.N.Y. 2016) (imposing a below-Guideline sentence of probation where the defendant's risk of recidivism was "almost zero").  Moreover, a sentence of 240 months' imprisonment is ample time for Mr. Manaf to complete rehabilitation courses provided by the place of his incarceration—as he has already begun doing while awaiting his sentencing.  *See* PSR ¶ 9 (listing Mr. Manaf's participation in educational training courses).

In sum, Mr. Manaf has suffered considerably throughout the six years he has spent in the "dreadful conditions" at the MCC and MDC, including during the pandemic.  *Chavez*, 710 F. Supp. 3d at 228; *see also id.* at 237 ("In the height of the COVID-19 pandemic, it was commonplace for courts to find that the conditions of confinement at the MDC and MCC constituted 'extraordinary

32

reasons' justifying release."). A sentence at the 20-year mandatory minimum would provide sufficient punishment for his conduct.

### CONCLUSION

For the foregoing reasons, Mr. Manaf respectfully seeks a sentence of 240 months' imprisonment. Pursuant to 18 U.S.C. § 3553(a), the mandatory minimum is more than sufficient to comply with the purposes of sentencing.

Dated: December 6, 2024
    New York, NY

                /s/ Arlo Devlin-Brown
                Arlo Devlin-Brown
                Amanda Kramer
                Lelia A. Ledain
                Dean S. Acheson
                Jacob T. Stark
                **COVINGTON & BURLING LLP**
                620 Eighth Avenue
                New York, NY 10018
                adevlin-brown@cov.com
                akramer@cov.com
                lledain@cov.com
                (212) 841-1000

                *Counsel for Haji Abdul Satar Abdul Manaf*